**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| PENNINGTON SEED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.:  3:12-cv-0254 (JRS)** |
| | ) | |
| THE SCOTTS MIRACLE-GRO | ) | |
| COMPANY, INC., and | ) | |
| | ) | |
| THE SCOTTS COMPANY LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| THE SCOTTS COMPANY LLC, | ) | |
| an Ohio limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No.: 3:12-cv-0168 (JRS)** |
| v. | ) | |
| | ) | |
| PENNINGTON SEED, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PENNINGTON SEED, INC.'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## INTRODUCTION

This matter comes before the Court on consolidated actions filed by Pennington Seed, Inc. ("Pennington") and The Scotts Company, LLC ("Scotts") challenging various advertising claims relating to both parties' grass seed and combination grass seed products under the Lanham Act.  A bench trial was held on these actions from July 29, 2013 through August 1, 2013.

Pursuant to stipulations entered into by the parties, the single issue to be resolved by the Court is whether each of the challenged advertising claims is false or misleading under 15 U.S.C. § 1125(a) ("Section 1125(a)").  Pennington proved at trial that several advertising claims made by Scotts touting the superiority of its combination grass seed product, EZ Seed, over Pennington's combination grass seed product, 1 Step Complete, are false and misleading, including the following:

- Scotts' EZ Seed "holds and retains water better than paper can."  Pennington Trial Ex. 88.

- Scotts' EZ Seed retains water in a way that "Pennington Complete [sic] just can't match."  Pennington Trial Ex. 90.

- Scotts' EZ Seed's "revolutionary growing material outperforms paper mulch."  Scotts Trial Ex. 217.[1]

- Other claims touting superior mulch in EZ Seed versus 1 Step complete.

As shown at trial, each of these superiority claims rests on the results of scientifically unreliable product testing, performed in a biased manner for the purposes of generating results favorable to Scotts.  Moreover, Pennington conducted testing—in a fair and scientifically reliable

---

[1] Scotts has withdrawn this particular advertisement pursuant to stipulation, *see* The Scotts Company LLC's Notice of Advertising Withdrawn Pursuant to Paragraph 7 of the Corrected Revised Stipulation to Narrow Issues for Remaining Discovery and Trial ("Scotts' Paragraph 7 Notice") at 2.  However, Scotts has not withdrawn the underlying claim. *Id.* at 1.  Because this claim is virtually identical in form and structure to the claims in Scotts' radio and television claims, it remains at issue.

manner, consistent with how consumers use the products—which further demonstrates that these claims are false, and therefore, violate Section 1125(a).  And Pennington's expert, Dr. Thomas Maronick, has shown that these false claims also mislead consumers into believing that 1 Step Complete is an inferior product as compared to EZ Seed.

In contrast, Scotts has not met its burden of proving that any of Pennington's advertising claims are false or misleading.  **First**, Scotts failed to prove that Pennington's claims that its Smart Seed product has "no filler, twice the seed" versus coated seed products are false or misleading.  Scotts conceded at trial that these claims are literally true by weight—the only measurement of grass seed used in the industry and the only manner in which the content of a bag of grass seed is presented to consumers on both parties' packaging.  And Scotts presented no credible or relevant evidence that consumers have been misled by this truthful advertising.  As demonstrated at trial and in Pennington's Motion to Exclude the Testimony of Scotts' Expert Jacob Jacoby (Dkt. 142), the Jacoby survey, which represents Scotts' only evidence of consumer deception, is irrelevant and scientifically unreliable and must be excluded pursuant to Federal Rules of Evidence 401, 402, and 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).  At a minimum, this fatally flawed survey should be given no weight.

**Second**, Scotts' claims regarding Pennington's "lift test" are moot in light of the fact that the relevant television commercial has been withdrawn pursuant to stipulation.[2]  *See* Pennington

---

[2] Given that the parties seek only injunctive relief, it would be inappropriate for the Court to issue an advisory opinion regarding advertising that has been withdrawn.  *See, e.g.*, *Burke v. City of Charleston*, 139 F.3d 401, 406-07 (4th Cir. 1998) ("[A]n injunction would lack binding or mobilizing effect upon the parties here.  The result would be an inappropriate advisory opinion, a result unequivocally barred by our supreme law."); *Miles v. Moore*, 2012 WL 4866561, at *4 (E.D. Va. Oct. 12, 2012) (noting, where plaintiff would no longer benefit from injunctive relief on his claim, "this case is no longer the live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law").

Seed, Inc.'s Notice of Withdrawn Claims and Advertisements Pursuant to Mat 3, 2013 Revised Corrected Stipulation ("Pennington's Paragraph 7 Notice") (Dkt. 135) ¶ 10. Moreover, Scotts failed to prove at trial that either this commercial or Pennington's point-of-purchase advertisement claiming deeper rooting is false or misleading. Indeed, the evidence adduced at trial establishes that Pennington's claims regarding its products' superior rooting ability are truthful and based on reliable scientific testing. And the fatally flawed Jacoby survey provides no evidence that these claims are misleading.

Pursuant to the Court's August 1, 2013 Scheduling Order, and based on the testimony and other evidence submitted at trial, Pennington submits its proposed findings of fact and conclusions of law and states as follows:

## PROPOSED FINDINGS OF FACT

## I. PARTIES AND PRODUCTS AT ISSUE

### A. PENNINGTON AND ITS PRODUCTS AT ISSUE

1. Pennington, a wholly owned subsidiary of Central Garden & Pet Company, is a producer and marketer of grass seed and combination grass seed products. *See* Trial Tr. 93:10-12; 94:13-19. Through its state-of-the-art "NexGen" research facility, Pennington is routinely on the cutting edge of developing top-quality, environmentally friendly grass seed products. *See* Ex. A to Plaintiff Pennington Seed, Inc.'s Memorandum of Law in Support of its Motion for Preliminary Injunction ("Pennington P.I. Memo.") (3:12-cv-254, Dkt. 40) ¶ 3.

2. One of Pennington's products, 1 Step Complete, is a comprehensive lawn-care product consisting of a blend of mulch, grass seed, and slow-release fertilizer. Trial Tr. at 94:20-21; Pennington Trial Ex. 55 ¶ 4. The mulch used in 1 Step Complete is a professional-grade, proprietary blend of wood fiber, cellulose fiber, fertilizer, polymers, and moisture. Pennington

Trial Ex. 55 ¶ 7.  The grass seed component of 1 Step Complete is Pennington's premium Smart Seed.  *Id.* ¶ 4.  1 Step Complete allows consumers to repair "problem spots" in their lawns and grow thicker, healthier grass than standard grass seed.  *Id.*

3.     Smart Seed is a drought-resistant, environmentally friendly seed, specially designed to reduce dependency on traditional watering and promote turfgrass establishment with natural rainfall or reduced watering frequency.  Pennington Trial Ex. 55 ¶¶ 6, 8, 9.  Smart Seed is enhanced by Pennington's MYCO Advantage™ seed technology, which promotes the growth of denser root systems and increases resistance to drought.  *Id.*  Smart Seed is pure seed, which is not covered with any coating or "filler."  Trial Tr. at 102:3-8.  Pennington intends for consumers to use Smart Seed to overseed an existing lawn or plant a new lawn.  *Id.* at 95:8-11.

**B.     SCOTTS AND ITS PRODUCTS AT ISSUE**

4.     Scotts and Pennington compete in the lawn and garden industry.  *Id.* at 53:4-8.

5.     Scotts offers a line of combination grass seed products, called EZ Seed, which compete directly with Pennington's 1 Step Complete combination products.  *Id.* at 53:18-23. Although the concentration and composition of the ingredients differ, EZ Seed, like 1 Step Complete, consists of mulch, seed, and fertilizer.  *See* Scotts' Brief in Support of Partial Summary Judgment (Dkt. 121) at 5.

6.     Scotts produces a Turf Builder line of straight grass seed products, which compete directly with Pennington's Smart Seed line of products.  Trial Tr. at 53:13-18.

7.     All Turf Builder products currently sold by Scotts are coated with a Water Smart coating, with the sole exception of Turf Builder Quick Fix.  *Id.* at 56:10-14.

8.     A bag of Turf Builder with Water Smart seed contains half seed and half coating or filler.  *Id.* at 84:16-18.

9.      Scotts' uncoated Turf Builder Quick Fix product—which is not sold on the websites of major retailers such as Wal-Mart and Lowe's, *see id.* at 89:18-23—is a commodity-grade product sold at a lower price point than coated Turf Builder products.  *Id.* at 89:24-90:1.  It is undisputed that this product does not compete with premium products such as Smart Seed. *See id.* at 95:16-21 (Jeffrey Crow, vice-president of marketing for the grass seed division with Central Garden and Pet, testifying that premium Smart Seed does not compete against Scotts' non-premium products); 238:14-21 (Michael Faust, Scotts' in-house scientist, acknowledging that Turf Builder Quick Fix is not a premium product).

10.      All Pennington's "twice the seed" advertisements for Smart Seed are either prefaced by the phrase, "no filler," *see*, *e.g.*, Scotts Trial Ex. 18, or limit the comparison to "coated seed products" (or both).  Trial Tr. at 100:10-102:8 (Mr. Crow testifying that the Smart Seed "twice the seed" advertisements are always made in the context of "no filler" or "versus coated seed products"); *see also* Scotts Trial Ex. 256.  Therefore, no comparison is made to Scotts' uncoated Quick Fix.

## II.     SCOTTS' FALSE ADVERTISING FOR EZ SEED

### A.     SCOTTS' EZ SEED ADVERTISING CLAIMS

11.      In March 2012, Scotts began airing a 30-second television advertisement that promotes EZ Seed and disparages 1 Step Complete.  Scotts has continued to run the commercial on national television through the present.  Ex. A to Pennington P.I. Memo. ¶ 9.  In the commercial, a bottle of Pennington's 1 Step Complete is clearly and unmistakably identified, while an actor describes it as "a bunch of ground-up paper."  Pennington Trial Ex. 88.  The actor goes on to state: "Scotts' EZ Seed uses the finest seed, fertilizer, and natural mulch that absorbs and holds water better than paper can."  *Id.*

5

12.     Beginning in approximately April 2012, Scotts began to air a radio version of the commercial similarly stating that Scotts' EZ Seed contains "the finest seed and fertilizer, with a natural mulch" that "absorbs and holds 8 times its weight in water," which is something "that ground-up paper in Pennington Complete [sic] just can't match."   Ex. C to Pennington P.I. Memo. ¶ 3; Pennington Trial Ex. 90.

13.     Scotts admits that the message of these advertisements is that EZ Seed is superior to and performs better than 1 Step Complete.  Trial Tr. at 78:19-24; 79:6-12.

14.     Scotts also makes claims regarding the superior water absorption and retention capabilities of EZ Seed products on its website and in its point-of-purchase advertising.  *See*, *e.g.*, Pennington Trial Ex. 92.

### B.     SCOTTS' SUPERIORITY CLAIMS FOR EZ SEED ARE BASED ON BIASED AND SCIENTIFICALLY INDEFENSIBLE TESTING

15.     Scotts purports to base its superiority claims for EZ Seed on internal testing supervised by Mr. Faust.  Trial Tr. at 65:14-19.  As Pennington's experts explained, these tests were not conducted in a scientifically reliable manner and were designed to achieve results favorable to Scotts.  *See*, *e.g.*, *id.* at 597:5-15 (Pennington's expert, Dr. Douglas Karcher, explaining that Mr. Faust ignored the instruction on both packages to apply the product 1/8-inch thick and in some tests applied EZ Seed at double the rate as 1 Step Complete); 598:5-14 (Dr. Karcher testifying that Scotts' claim that EZ Seed holds and retains water better than 1 Step Complete is not truthful because Scotts' tests did not take into account the soil environment).  Indeed, Mr. Faust ***admits*** his tests were not conducted in the fairest way possible, which would have included applying the products according to the directions on the labels.  *Id.* at 244:3-7.

16.     The tests conducted by Scotts' expert witnesses for the purpose of this litigation were similarly flawed and biased.  *See*, *e.g.*, *id.* at 574:8-14; 575:8-18 (Scotts' expert, Dr.

Norman Hummel, admitting that, in conducting his tests, he applied EZ Seed at double the rate as 1 Step Complete); 563:19-24 (Dr. Hummel acknowledging that the fairest test would be to compare equal amounts of product).

### 1. BIASED AND INCORRECT PRODUCT APPLICATION RATE

#### a. Label Instructions Not Followed

17.     Pennington's scientist, Kenneth Hignight, explained that both the 1 Step Complete and EZ Seed packages instruct the consumer, in multiple places, to apply the product 1/8 inch thick.[3] *Id.* at 383:10-14.  Scotts' experts, Mr. Faust, Dr. Hummel, and Dr. John Rogers, also acknowledge that both products instruct the consumer to apply them 1/8-inch thick.  *See id.* at 231:2-10; 517:9-18; 266:25-267:2.  Indeed, Mr. Faust testified that this label instruction was intended to deliver to consumers "a clear message on how to apply the product." *Id.* at 164:15-22.  Yet, Mr. Faust and Scotts' other experts admit that they ignored these clear label instructions and failed to conduct any testing applying the products 1/8-inch thick.  *Id.* at 231:2-10; 266:25-267:2; 517:9-18.

18.     Mr. Faust's tests applied EZ Seed at two different rates:  3.75 pounds per 40 square feet and 3.75 pounds per 80 square feet.  *Id.* at 160:15-24.  Mr. Faust admits that these "application rates" do not appear anywhere on the EZ Seed package.  *Id.* at 228:12-22.  Although EZ Seed was applied at two different rates, 1 Step Complete was applied at a single rate of 3 pounds per 60 square feet in all Mr. Faust's trials.  *Id.* at 160:8-12.

19.     Mr. Faust testified that, when testing EZ Seed for the purpose of research and development, Scotts applied the product at a rate of 1.875 pounds per 20 square feet.  *Id.* at

---

[3] Mr. Hignight further testified that, even the new version of the EZ Seed container (which is not the version Mr. Faust used in conducting his tests), which contains only a depiction of how to apply the product, still represents to consumers to apply the product on a volume basis, because it supplies no numbers to enable them to apply it on a weight basis.  *Id.* at 389:5-9.

228:16-18. However, he admits that this is not the rate that appears on Scotts' package. *Id.* at 228:12-15. He further admits that the fairest way to test products would be according to the way consumers would use them if they were following the package directions. *Id.* at 244:3-7.

20.     Dr. Rogers explained that he derived the application rates for EZ Seed he used in his testing from the label instructions, which direct consumers to apply the product 1/8-inch thick to bare spots and 1/16-inch thick to thin spots. *Id.* at 318:8-17. From these instructions, Dr. Rogers concluded that 1/16 inch must be the "minimum base application rate." *Id.* He admits, however, that nothing on the bottle he used says that 1/16 inch equals the "minimum base application rate," and in fact, the words "minimum base application rate" do not appear on the EZ Seed bottle. *Id.* at 319:14-20.

21.     Because the container stated that it covered "up to" 80 square feet, Dr. Rogers concluded that a 1/16-inch layer was intended to cover 80 square feet. *Id.* at 319:14-320:6. He then assumed that he should double this rate to arrive at the "bare spot rate." *Id.* at 320:4-9. Dr. Rogers admits that nothing on the bottle says to double the minimum base application rate to arrive at the bare spot rate. *Id.* at 323:15-22.

22.     In conducting his tests, Dr. Hummel merely applied the products at the same rates used by Dr. Rogers. *Id.* at 561:14-24. He admits that he did not independently calculate or verify that he should use these rates. *Id.* at 574:1-7. Rather, he testified, he used them because they were the rates ***Scotts' attorneys*** told him to use. *Id.* at 561:18-24; 573:20-22.

23.     Dr. Hummel admits that, had he conducted his testing on his own, without any instruction from Scotts' counsel, he would have applied both products 1/8-inch thick. *Id.* at 575:19-576:3; *see also* 6/18/2013 Examination before Trial of Norman Hummel, Ph.D. (Hummel Dep.) at 131:17-20 ("I mean I'll give you this one. If I were setting this up, this experiment up, I

would have done them both at the eighth-of-an-inch thickness.").[4]  He further admits that, during

his deposition, he "had some doubt" about whether he had used the correct application rate,

because the first thing that caught his eye was the instruction on the bags to apply the products

1/8-inch thick.[5]   Trial Tr. at 517:9-18.   Indeed, at his deposition, Dr. Hummel testified, "if

[Scotts] were basing an advertising claim on something that I did, I would recommend the eighth

of an inch" application rate for both products.  Hummel Dep. at 201:6-10.

24.     Dr. Karcher explained that there are several problems with using a weight-based

product application rate, as Mr. Faust and Scotts' other experts did.  Trial Tr. at 598:22-599:12.

First, a consumer would have to go through "convoluted calculations" just to arrive at the rate.

*Id.* at 598:24-599:2; *see also id.* at 323:8-14 (Dr. Rogers acknowledging that a consumer would

have to have "strong math skills" to perform the calculations he did to arrive at a weight-based

planting rate and that it would be "difficult" for the consumer to do so).   Then, having

ascertained the rate, the consumer would need to calculate the surface area to which he or she is

going to apply the product, "and the damaged areas are often irregularly shaped. . . . And

calculating the area of those damaged areas will be very difficult for a consumer to do."  *Id.* at

599:2-9.  Dr. Hummel likewise testified:

---

[4] The parties stipulated on July 12, 2013 that all challenges to admissibility of expert testimony
would be reserved until after trial and raised in post-trial briefing.  *See* 7/12/2013 Stipulation to
Narrow Pretrial Submissions (Dkt. 128) ¶ 4.   The parties further stipulated on August 30 that
each party will file only one post-trial submission, in the form of proposed findings of fact and
conclusions of law, which will include challenges to expert testimony.  *See* 8/30/2013 Stipulation
Regarding Post-Trial Submissions ¶ 1. Accordingly, citations to deposition testimony are
intended to be considered only in the context of an evidentiary challenge to expert testimony, as
contemplated by the July 12 and August 30 stipulations.

[5] Dr. Hummel testified at trial that he had changed a number of opinions he offered at his
deposition because he was "unprepared" on the issue of the application rates of the products.  *Id.*
at 528:20-529:5.  However, Dr. Hummel's considered expert opinion should not change based on
"preparation" by Scotts' counsel and other experts.

> Q.   But, you don't think it is appropriate for a consumer to pull out a calculator and start to calculate rates from the packages to figure out how much to apply on a rate basis?
>
> A.   I am sure it is not going to happen.
>
> Q.   It is complicated because there is a surface area and then there is an amount of product and you have to the products and it is a pretty complex formula?
>
> A.   Exactly.
>
> Q.   That's why these eight-inch [sic] type instructions are helpful to a consumer?
>
> A.   Yes.

*Id.* at 574:19-575:5.

25.   Dr. Karcher also explained that the photographs from Mr. Faust's trials demonstrate that his application method did not produce consistent results. *Id.* at 599:20-600:2. He testified that, from these photographs, it is evident that 1 Step Complete was applied at a higher rate in Mr. Faust's water absorption and release experiment than in his seedling establishment trials, even though he purportedly used the same rate in both. *Id.*; *see also* Scotts Trial Ex. 67 at 7, 27. Dr. Karcher opined that this stark contrast calls into question the accuracy of Mr. Faust's weight-based application methodology. Trial Tr. at 599:20-600:2.

26.   Although Scotts' experts purported to criticize the methodology of applying the products 1/8-inch thick, all in fact admitted that they cannot fault this methodology. *See*, *e.g.*, *id.* at 241:8-10; 330:10-17; 575:19-576:3.

27.   Dr. Rogers admits that, in a peer-reviewed article, he discusses experiments he conducted applying mulches on a depth basis, ¼-inch thick. *Id.* at 331:9-24. For the purpose of litigation, Dr. Rogers conducted an experiment solely in attempt to demonstrate that applying products on a depth basis is not a repeatable methodology. *Id.* at 267:23-268:12. Yet he

acknowledges that when he applied mulches at ¼-inch thickness for the purpose of his peer-reviewed article, he intended to provide a repeatable methodology and reported it as such. *Id.* at 333:10-17.  Although he now claims, in the context of litigation, that he "[doesn't] not like this particular paper," *see* 6/11/13 Video Deposition of John Nicholas Rogers III, Ph.D. ("Rogers Dep.") at 189:20-23, Dr. Rogers contends that all the conclusions he reached in this article—using a depth-based methodology—are valid.  Trial Tr. at 330:10-13.

28.     Mr. Faust acknowledges Dr. Rogers applied mulch products on a depth basis in a peer-reviewed article. *Id.* at 239:12-25.  He further testified that he does not criticize Dr. Rogers for having conducted his experiment in this manner. *Id.* at 241:8-10.

29.     Dr. Hummel testified that, although he opined under oath at his deposition that he should have applied the products 1/8-inch thick, he now believes that would be an inaccurate application rate. *Id.* at 517:15-519:3.  Yet, on cross-examination, Dr. Hummel acknowledged that, had he conducted these tests without instruction from Scotts' counsel, he would have applied the products 1/8-inch thick. *Id.* at 575:19-576:3.

### b.  EZ Seed Applied at Double the Rate of 1 Step Complete

30.     Pennington's experts testified that many of Scotts' superiority claims were based on tests in which EZ Seed was applied at nearly ***double the rate*** as 1 Step Complete. *Id.* at 372:12-18 (Mr. Hignight explaining that the results of one of Mr. Faust's tests, which was used as validation for Scotts' (withdrawn) claim that EZ Seed retains water for 30 hours as compared to 7 for 1 Step Complete, were based on EZ Seed applied at almost double the rate as 1 Step Complete); 598:5-14 (Dr. Karcher explaining that Mr. Faust's "thin spot rate" for EZ Seed was approximately equal to his application rate for 1 Step Complete, while his "bare spot rate" for EZ Seed was roughly double the rate for 1 Step Complete).

31.     Scotts' experts admit that many of their tests were conducted applying EZ Seed at double the rate as 1 Step Complete.  *See, e.g.*, *id.* at 574:8-14 (Dr. Hummel admitting that the instructions he received from Scotts' counsel resulting in him applying EZ Seed at double the rate as 1 Step Complete); 323:15-25 (Dr. Rogers admitting that, although he and Mr. Faust doubled the maximum coverage rate for EZ Seed to arrive at their "bare spot" rate, he did not conduct any tests in which he planted 1 Step Complete at double the maximum coverage rate).

32.     Scotts' experts further ***admit*** that the goal of their application method was to compensate for the differences in formulation between the two products—specifically, the fact that 1 Step Complete has more seed by weight than EZ Seed.  Mr. Faust testified, "I think that what you need to understand here is that just because when you are comparing equal amounts of application rate, it doesn't necessarily mean that the formulations are the same.  So if you break that formulation apart, there's actually more seed by weight in the 1 Step Complete product than there would be for EZ Seed."  *Id.* at 216:1-7.  Dr. Hummel likewise testified that the application rates he was told to use by Scotts' attorneys resulted in "***double product.  But, comparable seed rates***" for EZ Seed as compared to 1 Step Complete.  *Id.* at 574:8-14.  In other words, because Pennington places twice as much seed in 1 Step Complete versus EZ Seed, Scotts decided to double its application rate to provide an equivalent amount of seed.  *See id.* at 216:1-8; 574:8-14.

33.     The reason for this attempt to bias application rates in order to account for differences in formulation between the two products is clear:  Mr. Faust acknowledged that when he applied equal amounts of product, there were no statistically significant differences between the performance of the products.  *Id.* at 216:13-25; 215:22-216:1.  He testified, "so what I'm saying, though, is even though there was no statistical differences, you aren't comparing the

same amount of seed in each product." *Id.* at 216:13-15.  He went on to acknowledge that when he compared the same amount of product by weight, he got similar results. *Id.* at 216:16-25.

34.     Indeed, in light of the fact that his tests revealed no statistically significant differences in product performance when the products were applied at the same rate, Mr. Faust had to retract a number of the conclusions in his sworn Declaration that EZ Seed performed in a superior manner to 1 Step Complete in terms of seedling establishment.[6] *Id.* at 224:4-8; 225:3-13; 225:25-226:21; 227:2-14; *see also* Scotts Trial Ex. 228 ¶¶ 26, 29, 32.

35.     Dr. Hummel testified that many of his conclusions are derived from tests in which he applied EZ Seed at twice the rate as 1 Step Complete. *See*, *e.g.*, Trial Tr. 575:8-18.  For example, he admitted that his conclusion that EZ Seed held water for 14 hours as compared to 4 hours for 1 Step Complete was based on nearly double the application of EZ Seed. *Id.*  Indeed, Dr. Hummel admitted at his deposition that he would have to withdraw his conclusion that the water absorption and retention of the products is a "good indicator" that EZ Seed results in more plant-available water than 1 Step Complete, because, in fact, both products give up water at about the same rate. *Id.* at 566:4-21; 577:1-9; *see also* Hummel Dep. at 137:24-138:17.

36.     Dr. Hummel admits that the fairest comparison would have been to apply equal amounts of both products.  Trial Tr. at 563:23-24.

---

[6] Specifically, Mr. Faust admits, because EZ Seed and 1 Step Complete actually performed similarly when EZ Seed was applied at his "thin spot rate," he withdraws the conclusions in his Declaration that: (1) "[a]t each observation date, both the Bare and Thin Spot Rates of the EZ Seed® Product were significantly higher [in seedling counts] than the 1Step [sic] Product," Trial Tr. 225:3-13; Scotts Trial Ex. 228 ¶ 26; (2) "[o]n average, over the two lots of each product, the seedling counts in the Thin Spot Rate treatment of the EZ Seed® Product were always numerically higher than the 1Step [sic] Product at both 6 and 11 [days after planting]," Scotts Trial Ex. 228 ¶ 29; Trial Tr. 225:25-226:21; and (3) "[w]hether applied at the Bare or Thin Spot Rates, the EZ Seed® Product had significantly higher percent turfgrass ground cover ratings than the 1Step [sic] Product at both 28 and 42 [days after planting]," as well as the accompanying photograph.  Scotts Trial Ex. 228 ¶ 32; Trial Tr. at 227:2-14.

### c.   Products Not Applied so as to Form a Complete Layer

37.     Mr. Hignight explained that products for patch and repair, such as 1 Step Complete and EZ Seed, should be applied at a higher thickness (1/8-inch) than products for establishing a new lawn or overseeding, because patch and repair products are being applied to an area that has already been problematic, by a consumer who is likely not the best at taking care of his or her lawn.  *Id.* at 386:24-387:7.  Dr. Rogers acknowledges that major retailers such as Home Depot market EZ Seed as a patch and repair product.  *Id.* at 315:16-22; *see also* Scotts' Trial Exhibit 50 at 1-2 (Home Depot display showing EZ Seed in the "patch and repair" section and Turf Builder in the "new lawn/overseeding" section).

38.     Mr. Hignight also testified that, in the context of a combination, patch and repair product, such as 1 Step Complete and EZ Seed, "[w]hat's important for mulch is to provide cover over the surface [of the soil] and slow the evaporation process.  If you have this covering a barrier, you slow that water loss down."  *Id.* at 361:19-23.  Dr. Karcher likewise opined that "for the paper and wood fiber based products [such as 1 Step Complete], it is very important to have near complete coverage of the soil surface. . . ."  *Id.* at 600:15-19.

39.     Dr. Rogers agrees with Pennington's experts:  In a published article, he opined that mulch should be applied so as to form a protective layer over the soil.  *Id.* at 327:9-25; *see also* Pennington Trial Ex. 15 at 2.  Dr. Rogers testified at trial that this protective layer "is intended to cover both the soil and the seed.  The idea being to keep both of these from washing away. . . ."  Trial Tr. at 327:23-328:2.  He further testified that he agrees with the statement in his article that the purpose of a mulch is to protect the seed surface from exposure to the evaporative water loss.  *Id.* at 346:5-17.

14

40.     Similarly, in the peer-reviewed article in which Dr. Rogers applied mulch products at ¼-inch, he did so as to form an even layer over the soil.  Trial Tr. at 330:4-331:24; *see also* Pennington Trial Ex. 16 at 3.  Although Dr. Rogers opined on direct examination that, in the case of a mulch such as 1 Step Complete, he would recommend 50 to 75 percent coverage over the soil, Trial Tr. at 277:1-8, he admitted that he says nothing about these coverage rates in his peer-reviewed article, in which the mulch products were applied evenly over the soil.  *Id.* at 334:13-16.

41.     Scotts' experts did not apply the products so as to achieve a complete layer over the soil.  *See id.* at 329:2-6 (Dr. Rogers admitting that he did not apply the products so as to form a complete layer over the soil); 598:22-599:18 (Dr. Karcher testifying that it is obvious from the photos of Mr. Faust's tests that the products did not form a complete layer over the soil surface); 383:24-384:15 (Mr. Hignight explaining that pictures of his attempt to put down 1 pound per 20 square feet of product, as Mr. Faust and Dr. Rogers did, did not result in the mulch creating a barrier over the soil); *see also* Scotts Trial Ex. 275; Scotts Trial Ex. 67 at 7.

42.     Dr. Karcher testified that Scotts' application rate of 1 Step Complete would result in only minimal benefit of the mulch in terms of protection of the soil surface.  Trial Tr. at 600:7-19.  Mr. Hignight testified that he conducted a test in which both products were applied at Scotts' maximum coverage rates, and that, at this rate, the products provided no mulch benefit—both performed exactly the same as soil, which was tested as a comparison.  *Id.* at 379:22-380:4.

### 2.   TESTING UNRELATED TO CONSUMER USE

43.     Scotts' vice president of marketing for the gardens division, John Sass, admits it is inappropriate to test products in a medium the consumer would never use and make claims based on these tests, because it would be misleading.  *Id.* at 86:17-87:1.  Scotts' experts likewise

15

admit that testing of products should mimic the conditions consumers experience. *Id.* at 217:3-6 (Mr. Faust testifying that testing should mimic the outdoor growing conditions consumers experience); 555:18-23 (Dr. Hummel admitting that if he were asked to conduct a study to advise consumers on how they can expect the product to perform, he would conduct the experiment in the way that is most similar to how consumers would actually use the product).

44.     Scotts' experts all admit that their application rates did not replicate consumer use of the products. *See*, *e.g.*, *id.* at 323:8-13 (Dr. Rogers admitting that it would be "challenging" for a consumer to arrive at his application rate); 574:19-23 (Dr. Hummel stating, in regard to whether a consumer would calculate and utilize his application rates, "I'm sure it's not going to happen"); 164:15-22 (Mr. Faust testifying that the 1/8-inch label instruction was intended to deliver to consumers "a clear message on how to apply the product").

45.     In addition to ignoring label instructions, none of Mr. Faust or Dr. Hummel's tests account for the products' interaction with the underlying soil, nor do their tests replicate real-world watering conditions. *See*, *e.g.*, *id.* at 218:9-219:11 (Mr. Faust admitting that that his water absorption and release experiments did not replicate consumer experience because consumers apply the product to soil and water them from above); 572:17-573:2 (Dr. Hummel admitting that his water release study is inapplicable to real-world conditions, where consumers sprinkle the product down and apply water to it from above).

### a.  Tests Did Not Account for Products' Interactions with Soil

46.     Both Mr. Faust and Dr. Hummel admit that their water absorption and release experiments do not reflect consumer use, because they were performed without soil. *Id.* at 218:14-23 (Mr. Faust acknowledging that his tests were performed without soil and that EZ Seed and 1 Step Complete are not used by consumers without soil); 524:20-22 (Dr. Hummel testifying: "Q. Does your testing reflect consumer experience?  A. Does it reflect consumer

experience? Well, obviously, we are not putting this material on a soil."). Mr. Faust further admits that consumers are only concerned with how the product performs on soil. *Id.* at 218:20-23. Dr. Hummel likewise testified that the only purpose of these products is to use them on top of soil. *Id.* at 543:13-16. Therefore, he acknowledged, the water retention characteristics of both products when they are applied on top of soil is very relevant to consumers. *Id.* at 548:11-14.

47.     Mr. Hignight testified, "if you are going to study mulch products, and you're going to relate them to the consumer, I think we will have to look at them on soil to check the response. Because the competition with water on soil is likely different than it would be on plastic." *Id.* at 373:19-23. He further explained that, because Mr. Faust tested the products on plastic, "there is no interaction with the plastic. In other words, the plastic is not going to absorb water. But, when we use them as products are instructed to be used on a soil, there is competition for that water. So you're going to see a different reaction on soil than you're going to see on plastic because of the competition, it can soak into the soil." *Id.* at 369:24-370:8. Dr. Karcher also testified that it is important to test the products on soil because "the primary function of the mulch in these products is to help retain water in the underlying soil, not necessarily to retain water in the product themselves." *Id.* at 609:1-4.

48.     Both Mr. Faust and Dr. Hummel admit that, because they did not conduct any tests on soil, they cannot say whether EZ Seed retains water in a superior manner as compared to 1 Step Complete when the products are used as intended, on soil. *Id.* at 220:13-17 (Mr. Faust admitting that he has no empirical data regarding the water holding or release capabilities of the products on soil); 576:18-22 (Dr. Hummel admitting that he cannot say whether EZ Seed retains water in a superior manner to 1 Step Complete when the products are used on soil).

      **b.  Because They Did Not Test the Products on Soil, Scotts' Experts Can Only Hypothesize About Plant-Available Water**

49.     Dr. Karcher explained that "plant-available water" refers to water that is available for uptake from turfgrass roots.  *Id.* at 607:19-21.  He further explained that, because the objective for products such as EZ Seed and 1 Step Complete is that the turfgrass plants root into the soil, as opposed to the mulch, measuring the plant-available water of the mulch in isolation from the soil is not relevant to how the products are used.  *Id.* at 607:21-608:1.

50.     Dr. Hummel likewise testified that the goal when watering combination products such as EZ Seed and 1 Step Complete is that the water get into the soil, so that the soil can be moist for the seeds to root, germinate, and grow.  *Id.* at 535:16-20.  Mr. Faust also acknowledged that the relevant question regarding the performance of these products is how the product will help the soil retain water, as opposed to how much water the mulch will hold.  *Id.* at 219:16-20.

51.     Mr. Hignight explained that a mulch can only provide plant-available water to germinating seed to the extent the seed is contained in the mulch, and that eventually, the roots of the plant have to get into the soil to grow.  *Id.* at 362:24-363:5.  Dr. Karcher similarly testified that, because turfgrass plants obtain plant available water through their root system, which is located in the underlying soil, it does not make any sense to rely on data regarding the water absorption or retention of only a mulch (tested without soil) to make inferences regarding plant-available water.  *Id.* at 608:4-7.

52.     Dr. Karcher also explained that a mulch that is highly absorbent may wick water away from the soil.  *Id.* at 612:10-15.  He further explained that EZ Seed and 1 Step Complete would have to be tested on soil to ascertain the likelihood that the mulch in these particular products will pull water away from the soil.  *Id.* at 612:16-18.

53.     Indeed, Scotts' experts admit that, because they did not test the products on soil, they can only hypothesize regarding whether the mulch in EZ Seed will wick water out of the

soil in dry conditions.  *See*, *e.g.*, *id.* at 174:14-21; Hummel Dep. at 24:12-25:11.  Mr. Faust acknowledged that he has not done "exact testing" on whether the mulch in EZ Seed will wick water from the soil when conditions are drying up, but he admits that mulches have the ability to pull in water from the soil in order to stay wet.  Trial Tr. at 174:14-21.  Dr. Hummel testified at his deposition that he has a "hypothesis" that the mulch in EZ Seed will not wick water out of the soil, but he admitted that he cannot say for certain whether this hypothesis is correct because he has not conducted any testing.  Hummel Dep. at 24:12-25.  However, Dr. Hummel admits that, when a mulch is sitting on top of soil, water will evaporate first from the mulch, after which the mulch may potentially attempt to grab water from the soil.  Trial Tr. at 537:1-10.  He further admits that, to the extent there is a higher energy potential in the mulch than the soil (i.e., the mulch is dry and the soil is wet), water will move out from the soil and into the mulch until there is the same energy potential in the mulch as in the soil.  *Id.* at 537:11-538:8.

### c.  Irrigation Did Not Replicate Consumer Use

54.  Both Mr. Faust and Dr. Hummel conducted water absorption and release experiments in which they saturated the products from beneath them.  *See*, *e.g.*, *id.* at 159:1-3; 568:25-569:10.  Mr. Faust explained that, in conducting his water absorption and release experiments, "the methodology we chose to use was using a subsurface soak by putting these materials into a PVC tray that was lined with an erosion fabric."  *Id.* at 159:1-3.  Similarly, Dr. Hummel conducted his water release study by lowering cores filled with product with a cheesecloth on the bottom into a bucket and then adding water to the bucket, allowing the cores to saturate from the bottom up.  *Id.* at 568:25-569:10.

55.  Both Mr. Faust and Dr. Hummel acknowledge that consumers do not irrigate their grass seed products by putting them into a water bath.  *See*, *e.g.*, *id.* at 219:4-11; 553:2-10.  When asked if subsurface irrigation is a common practice used by consumers in lawn

establishment, Dr. Hummel responded, "of course not." *Id.* at 553:2-10. He further admitted that his water release study is inapplicable to the real-world situation where the consumer buys the product, sprinkles it down, and applies water to it from above. *Id.* at 572:17-573:2.

56.     Mr. Hignight and Dr. Karcher likewise testified that the methodology of soaking the products in a bath does not replicate the way consumers will irrigate the products. *Id.* at 370:9-14; 601:7-10.

57.     Mr. Faust admits that, as a result of his unnatural irrigation method, EZ Seed had twice as much water in it as 1 Step Complete at the beginning of his water release testing, because EZ Seed absorbed twice as much water. *Id.* at 222:7-9. He further acknowledges that his water release testing actually showed that EZ Seed lost water at a faster rate than 1 Step Complete.[7] *Id.* at 222:4-6.

58.     Dr. Hummel also conducted "dry down" testing, in which he added water to samples of product "until visually it looked like it was saturated" and then allowed the samples to set overnight. *Id.* at 511:14-17. He acknowledged that, at the time he conducted this testing, both the EZ Seed and 1 Step Complete labels instructed the consumer to water the products thoroughly. *Id.* at 540:22-541:2. Dr. Hummel also admitted that when a consumer waters the product using a water hose or watering can, he or she would not know whether the products were saturated. *Id.* at 541:3-9. He further admitted that he does not know whether a consumer could achieve saturation just by watering the products with a hose or watering can. *Id.* at 541:14-18.

C.     **SCOTTS' EXPERTS ADMIT THAT A HIGHLY ABSORBENT MULCH SUCH AS THAT IN EZ SEED PERFORMS POORLY IN TERMS OF WATER RETENTION IN THE SOIL.**

---

[7] Mr. Faust also admits that valid conclusions cannot be drawn from tests that are not statistically significant, and he did not provide any statistical analysis of his water release study. *Id.* at 221:14-19.

59.     Dr. Karcher, Dr. Rogers, and Dr. Hummel all testified that a lower-absorbing mulch (such as that in 1 Step Complete), will perform better than a higher-absorbing mulch (such as that in EZ Seed), because it will allow more water to seep into the soil.  *See id.* at 606:3-5 (Dr. Karcher opining that the best-performing mulches are lower-absorbing mulches, including paper-based products (such as 1 Step Complete)); 347:5-15 (Dr. Rogers admitting that, in a published article, he opined that hydro mulch, which is made of shredded paper (similar to the mulch in 1 Step Complete), is very effective at maintaining soil moistures); 546:21-547:1 (Dr. Hummel testifying that if the same amount of water is applied to both products, 1 Step Complete should allow more of the water to seep down into the soil).

60.     Dr. Karcher explained that highly absorbent mulches make poor mulches because they are less likely to allow moisture to infiltrate into the soil.  *Id.* at 606:17-22.  In addition, highly absorbent mulches are more likely to increase the rate at which water is pulled from the soil back up into the mulch and evaporated into the atmosphere.  *Id.* at 606:22-607:2.

61.     Dr. Hummel similarly acknowledged, "I know there has been some data in the research literature, and the research literature has concluded that these mulches have the possibility of pulling water out of the soil."  *Id.* at 526:2-5.  He further testified, "going back to the literature, the reason that [highly absorbent mulches] are considered not good mulches is because they have the potential of holding the water at tensions that are too high to be plant-available to the plant."  *Id.* at 526:24-527:2.

62.     Dr. Rogers also testified that a highly absorptive mulch is not desirable in a combination product such as EZ Seed and 1 Step Complete, because it could hold water and pull it away from the soil where the seed is intended to germinate.  *Id.* at 346:28-347:3; 347:22-25.

21

He further testified that a mulch that absorbs eight times its weight in water and does not release it into the soil would be "terrible" in a combination product. *Id.* at 349:12-18.

63.     Indeed, in a peer-reviewed article, Dr. Rogers opined, "the more absorptive the mulch the more moisture is lost from the seedbed. Since the purpose of a mulch is to protect the seedbed surface from exposure to the evaporative water loss, the less absorptive the mulch the less water is brought up to the surface to be exposed and therefore the more moisture is held in the seedbed." *Id.* at 346:5-17; *see also* Pennington Trial Ex. 16 at 3. Dr. Rogers testified that he still agrees with this statement. Trial Tr. at 346:5-17.

64.     Dr. Rogers attempted to qualify his opinion that highly absorptive mulches make poor mulches by limiting his opinion solely to mulches that do not release water back to the plant. *Id.* at 302:12-15. He further claimed that EZ Seed releases water back to the plant and is therefore an exception to his opinion that highly absorptive mulches are poor mulches. *Id.* at 302:18-24. However, he acknowledged that he has not conducted any studies to prove this. *Id.*

65.     Dr. Karcher explained that Dr. Rogers' qualification that highly absorptive mulches that release water back to the plant are not poor mulches is inaccurate. *Id.* at 609:5-14. Dr. Karcher and Dr. Rogers both testified that common peat does not work well as a mulch. *Id.* at 609:17-20; 348:9-16. Dr. Karcher explained that peat absorbs and retains a lot of water and that almost all of that water is plant-available. *Id.* at 609:20-22. However, peat still makes a very poor mulch because it retains the plant-available water right at the soil surface, as opposed to allowing it to penetrate into the soil. *Id.* at 609:25-610:2.

66.     Moreover, in his article, Dr. Rogers does not qualify his assertion that highly absorptive mulches are poor mulches. *See* Pennington Trial Ex. 16. Dr. Karcher also testified

that Dr. Rogers' article on mulches makes no mention of the ability to release water improving the performance of a highly absorptive mulch.  Trial Tr. at 610:6-17.

67.    Dr. Karcher further testified that he has not seen any studies comparing the performance of the mulch in EZ Seed to other highly absorptive mulches, and thus, based on the literature, it is impossible to say that it would perform any better.  *Id.* at 611:2-8.

### D.    MR. HIGNIGHT'S TESTS DEMONSTRATE THAT SCOTTS' TESTING WAS FLAWED AND THAT ITS CLAIMS ARE FALSE.

68.    The results of the tests conducted by Mr. Hignight and analyzed by Dr. Karcher, which treated the products fairly and attempted to replicate real-world conditions, expose Scotts' tests as biased and unreliable and demonstrate that Scotts' superiority claims are false.  *See, e.g.*, 603:19-25 (Dr. Karcher testifying that the results of Mr. Hignight's tests, which were conducted applying equal amounts of product, on soil, revealed that 1 Step Complete retains significantly more water than EZ Seed).

69.    Mr. Hignight used equal amounts of product and applied equal amounts of water in all his tests, in order to treat the products fairly and to limit variables.  *Id.* at 367:1-11.

70.    Mr. Hignight conducted a test entitled "2012 Comparison of Two Seed Mulch Products for Water Retention," in which he placed five one-gram samples each of EZ Seed and 1 Step Complete into weight boats and added half a gram of water to the top of the samples in droplet form.  *Id.* at 365:1-23.  He testified that the package directions for EZ Seed at the time instructed to water the product until it turned dark brown, and that he observed EZ Seed turn dark brown and swell in size after the water application.  *Id.* at 367:12-20.  Mr. Hignight then placed the samples into a controlled environmental chamber and measured the disappearance of water every 30 minutes.  *Id.* at 365:24-366:1.  The statistical analysis of the results of this test

(performed by Dr. Karcher) revealed that when EZ Seed had lost 75 percent of its water, 1 Step Complete retained 20.7 percent more water. *Id.* at 366:20-25.

71. Mr. Hignight also conducted nine tests measuring the water retention of the products when applied on soil. *Id.* at 374:23-25. He conducted two "beaker studies" in which he put two inches of soil in beakers and then applied the products, at either 1/8-inch thick or at the maximum coverage rate listed on the bags. *Id.* at 375:14-25. He explained that he applied the products at a depth basis by first applying 1/8-inch of product to the area that would be used in the test and then removing the product and weighing it. *Id.* at 376:5-12. This was done 10 times, and then the 10 weights were averaged. *Id.* at 376:12-15. The product was then applied at that weight, so the same weight of product was applied within each trial. *Id.* at 376:12-19.

72. Mr. Hignight applied nine times the weight of the product in water to the beakers containing the equivalent of 1/8-inch of product, in order to make sure the products were saturated. *Id.* at 377:6-9. He applied this water from above, in droplet form. *Id.* at 377:6-10. For the products applied at the maximum coverage rates, Mr. Hignight applied water to some of the samples at nine times the weight of the product. *Id.* at 377:12-14. For other samples, he used the same amount of water he applied the samples where the product was applied 1/8-inch thick, which amounted to 65 times the weight of the product. *Id.* at 377:14-17.

73. The statistical analysis of these tests showed that when the products were applied 1/8-inch thick, when EZ Seed had lost 65 percent of its water, 1 Step Complete had retained 40.5 percent more water. *Id.* at 381:9-14.

74. In contrast, the analysis of the products applied at the maximum coverage rate revealed no statistically significant differences in product performance. *Id.* at 380:13-20. In fact, both 1 Step Complete and EZ Seed applied at the maximum coverage rates performed the same

as soil, which Mr. Hignight tested for comparison, in regard to water retention.  *Id.* at 379:22-380:12.  Mr. Hignight explained that this was because the mulches did not cover the soil so as to create a barrier over it.  *Id.* at 380:10-12.

75.    Dr. Rogers criticized Mr. Hignight for applying the products 1/8-inch thick and testified that his primary critique of this application rate is that it does not provide a repeatable methodology, if the products are not weighed.  *Id.* at 267:16-22.   However, Dr. Rogers acknowledges that in his peer-reviewed article in which he applied mulches on a depth basis (and did not weigh the mulch), he intended to provide a repeatable methodology.  *Id.* at 333:10-17.  Moreover, Dr. Rogers' criticism is irrelevant to Mr. Hignight's methodology, as Mr. Hignight applied the same weight of product within each of his trials.  *Id.* at 376:5-19.

76.    Dr. Hummel criticized Mr. Hignight's tests because they did not measure how much water each product was capable of absorbing.  *Id.* at 540:2-6.  But Dr. Hummel admitted that Mr. Hignight did not indicate that the intent of his tests was to measure water absorption. *Id.* at 540:7-10.  Dr. Hummel also admitted that his own study, in which he saturated the products, still only measured release rates.  *Id.* at 541:24-542:2.  He further acknowledged that Mr. Hignight's water application replicated the consumer experience, because a consumer would not know if the product is saturated when it is laying on the ground.  *Id.* at 544:22-545:3

77.    Dr. Hummel also critiqued Mr. Hignight's beaker studies as "uninformative" because of his use of soil.  *Id.* at 543:8-12.  Yet Dr. Hummel admits that these tests (in contrast to his own tests) were designed to attempt to replicate the experience of a consumer, who applies the product to soil.  *Id.* at 544:13-17; 547:2-11.

78.    Dr. Karcher's analysis of the standard deviation values Mr. Faust provided with his tests revealed coefficient of variation values between 80 and 95 percent; in contrast, in Mr.

Hignight's trials the coefficient of variation values were all less than 5 percent.  *Id.* at 604:12-17. As Dr. Karcher explained, this means there was much less experimental error in Mr. Hignight's tests than Mr. Faust's.  *Id.* at 604:5-19.  Dr. Karcher explained that his statistical analysis revealed that there was "a lot of experimental error" in Mr. Faust's tests.  *Id.* at 603:3-6.

79.     From his analysis of Mr. Faust's and Mr. Hignight's tests, Dr. Karcher concluded, "[a]ccording to Mr. Hignight's studies, when both products are applied on soil, and given equivalent amounts of water, [EZ Seed] certainly does not retain more water than 1 Step Complete.  Mr. Faust's data showed, only when you start off with EZ Seed containing 2X or 4X more water, then it retains water longer."  *Id.* at 604:22-605:3.

### E.  PENNINGTON'S CONSUMER SURVEY DEMONSTRATES THAT SCOTTS' FALSE SUPERIORITY CLAIMS MISLEAD CONSUMERS

80.     Pennington's consumer survey expert, Dr. Maronick, a highly regarded marketing and consumer research expert, testified that the EZ Seed television commercial misleads and deceives a substantial number of consumers into believing that EZ Seed is a superior product and 1 Step Complete is an inferior product.  *Id.* at 777:1-5; 778:1-17.

81.     Dr. Maronick employed reliable and well-accepted survey methodology in conducting his survey.  Dr. Maronick surveyed individuals who were likely to buy grass seed for patching a lawn within the next six months.  *Id.* at 774:13-23.  He then divided these respondents into a test group and a control group.  *Id.* at 775:2-3.  The test group was shown an unmodified version of the EZ Seed commercial in which the claim that 1 Step Complete is "a bunch of ground-up paper" and that EZ Seed "absorbs and holds water better than paper can" were included.  *Id.* at 775:3-7.  The control group was shown a modified version of the commercial in with these superiority statements were removed.  *Id.* at 775:7-11.

82.     Dr. Maronick used open-ended questions, such as "what does it say or suggest about the ad," "what was the main idea" of the ad, and "anything else?" in his survey. *Id.* at 776:12-21. Both Scotts' and Pennington's survey experts testified that open-ended survey questions are preferable to closed-ended questions in that they limit the possibility that bias in the questions influenced the responses. *See*, *e.g.*, *id.* at 774:7-12 (Dr. Maronick explaining, "universally everyone will agree, I think, that open-ended questions are better because there's no bias or virtually no bias when you ask a question where the consumer simply says, in this case, what's the main idea. There is no hint as to what you are looking for. . . ."); 810:15-21 (Pennington's rebuttal expert, Dr. Gary Ford, testifying, "open-ended questions are generally considered to be the more important of questions in a litigation survey because well-crafted open-ended questions do not lead . . . the respondent, to think about things they wouldn't have thought about without the prompting associated with the question"); 734:25-735:5 (Scotts' rebuttal expert to Dr. Maronick, Dr. Jacob Jacoby, testifying that one advantage of open-ended questions is that there is no possibility that the question influenced that answer).

83.     In response to Dr. Maronick's unaided, open-ended questions, 42 percent of respondents in the test group (versus only 17 percent in the control group) stated that the main idea of the commercial is that EZ Seed is superior to 1 Step Complete. *Id.* at 777:25-778:6; 778:11-17. Specifically, these respondents said that the commercial conveys such false messages as that EZ Seed "is better," the "best," "works better," works "faster," and "holds water better" as compared to 1 Step Complete. *Id.* at 778:1-10.

84.     Ultimately, a net of 24.3 percent of respondents were deceived by the demonstrably false claims in Scotts' commercial that EZ Seed is a superior product to 1 Step Complete. *Id.* at 778:13-17. This is well above the 15 percent threshold courts typically use to

27

establish deception.  *See*, *e.g.*, P.I. H'rg Tr. at 279:7-280:1 (Dr. Jacoby testifying that 15 percent is the threshold used by courts to establish consumer deception).

85.     The responses to Dr. Maronick's survey were coded by an outside company, Radius Global, which has no connection to either party.  Trial Tr. at 788:9-16.

86.     Dr. Maronick explained that the statements "bunch of ground-up paper" and "holds and retains water better than paper can" together convey a message of product superiority. *Id.* at 798:3-17.  He further explained that the message of the commercial is "we are better because they are a 'bunch of ground-up paper' and Scotts holds water better than paper." *Id.* at 798:9-11.  Therefore, he expounded, the logical implication of these claims, together, is that if 1 Step Complete is a bunch of ground-up paper, and EZ Seed holds water better than paper can, then EZ Seed is better than 1 Step Complete.  *Id.* at 798:11-17.

87.     Indeed, Mr. Sass admits that the message of this commercial is that, "with respect to the mulches that coir [the mulch in EZ Seed] does perform better than Pennington's mulch." *Id.* at 78:19-24.  He likewise admits, in regard to Scotts' similar radio advertisement, "the ad shows or tells that the mulch [in EZ Seed] absorbs eight times its weight and that mulch is better than Pennington's mulch." *Id.* at 79:6-12.

88.     Scotts' rebuttal expert to Dr. Maronick, Dr. Jacoby, offered no critique of Dr. Maronick's survey in his testimony.

## III.   SCOTTS' UNFOUNDED CLAIMS AGAINST PENNINGTON

### A.     THE CHALLENGED ADVERTISING

89.     Scotts challenges Pennington's Smart Seed labels and point-of-purchase advertising alerting consumers to the fact that Pennington's Smart Seed products contain no filler

and therefore have twice the seed as Scotts' coated Turf Builder products.[8]  Scotts Trial Ex. 92 ¶ 10.  Specifically, Pennington's 2012 Smart Seed labels and display bins stated that Smart Seed contains "no filler | twice the seed vs. coated seed products."  *Id.*; *see also* Scotts Trial Ex. 256.  Some of Pennington's 2012 display trays also stated, "no filler | twice the seed vs. Scotts' Turf Builder."  Scotts Trial Ex. 92 ¶ 10; Scotts Trial Ex. 18.  However, Mr. Crow explained that these display trays are no longer being used.  *Id.* at 103:2-10.

90.     The crux of Scotts' argument is that Pennington's Smart Seed "no filler, twice the seed" claims are false and misleading because Smart Seed may not always contain twice the *number* of seeds as coated Turf Builder products.  Scotts Trial Ex. 92 ¶ 11; *see also* Trial Tr. 20:6-14.  Scotts also alleges that Pennington's 2012 display trays did not limit the comparison to coated Turf Builder products, and thus, were false or misleading in regard to Scotts' one uncoated, commodity-grade Turf Builder product, Quick Fix.  *See* Trial Tr. at 55:8-17.

91.     Scotts also challenges a video clip of a lift test, which appears at the end of its 2012 1 Step Complete television commercial.  Trial Tr. at 20:15-25.  This commercial has been withdrawn by stipulation.  *See* Pennington's Paragraph 7 Notice ¶ 10.

92.     Scotts further challenges one of Pennington's display racks stating that the "professional-grade mulch" in 1 Step Complete "drives deep healthy roots" and showing an image of two "lift tests," with one plot successfully lifting and another not.  Scotts Trial Ex. 92 ¶ 54.  This advertisement does not compare 1 Step Complete to any other product, but instead, depicts a jug of product with no label behind the image of the unsuccessful lift test.  *Id.*

**B.     "NO FILLER, TWICE THE SEED" IS BASED ON WEIGHT, NOT NUMBER OF SEEDS**

---

[8] Pennington's 2011 Smart Seed television commercial similarly alerted consumers to the fact that a bag of Smart Seed contains no filler and therefore has twice the seed as a bag of coated Turf Builder the same weight.  *See* Scotts Trial Ex. 227.  Scotts has not directly challenged this commercial.  *See* generally Scotts Trial Ex. 92.  Moreover, this commercial is no longer running.

93.     The import of Pennington's advertisement must be considered in the context of how grass seed is sold to consumers, as Scotts recognizes.  *See* Trial Tr. at 86:3-6 (Mr. Sass testifying that claims made in advertising should be based on real world application of the product).  In accordance with federal and state laws, seed product labels—including Scotts'—identify the amount of seed in a bag based on percentage weight.  *Id.* at 82:8-11.  In addition, the industry standard is to measure grass seed by weight, not number of seeds.  *Id.* at 395:24-396:4.  Mr. Faust explained, "[seed] is sold by weight," because to put the number of seeds—hundreds of thousands or millions per bag—on the bag, "is just not practical.  That's why we sell by weight."  *Id.* at 144:20-23.

94.     Scotts admits that Turf Builder with Water Smart is half seed and half coating or filler.  *Id.* at 84:16-18.  Thus, a bag of coated Turf Builder is half rock by weight.  *Id.* at 85:3-4.

95.     Because Turf Builder is half filler by weight, witnesses from both parties agree that a bag of Smart Seed contains twice as much seed, by weight, as coated Turf Builder.  *See*, *e.g.*, *id.* at 205:8-15 (Mr. Faust testifying that Pennington's "twice the seed" claim is literally true on a weight basis); 390:17-391:2 (Mr. Hignight testifying that Pennington's claims are truthful because Smart Seed always has twice the seed by weight as Turf Builder).  Thus, Scotts ***admits*** that Pennington's claims are true on a weight basis.  *Id.* at 205:8-15; P.I. Hr'g Tr. at 168:8-11.

96.     Pennington's experts explained that it is not practical, or even possible, to count the number of seeds in a bag of grass seed for labeling purposes.  *See* Trial Tr. at 587:24-588:9; 396:12-17.  Dr. Karcher explained that it is not sensible to count the number of seeds in a bag, because the ratios of species and cultivars in a bag change over time and based on the location the product is sold, and because the high number of seeds per bag would make such a count "very difficult."  *Id.* at 587:24-588:9.  Mr. Hignight likewise opined that it would be

"impossible" to count the number of seeds in a bag for the purpose of product labeling.[9]  *Id.* at 396:12-17.

97.    Dr. Karcher further testified that a product with a higher number of seeds per bag would not benefit the consumer if the seeds are not well-adapted to the region where they are being applied.  *Id.* at 588:15-20.  For example, a product with a lot of Kentucky bluegrass may have a higher number of seeds than a product with larger seeds, but it would not perform well if Kentucky bluegrass is not well-adapted to the region where the product is sold.  *Id.* at 588:13-20.

98.    Dr. Karcher further explained that there is published literature showing that products with larger seeds may germinate faster and produce more plants than products with smaller seeds.  *Id.* at 662:5-9.  He testified that Dr. Nick Christians, a professor at Iowa State, published a paper opining that a higher rate of turfgrass establishment has been attributed to use of larger grass seeds.  *Id.* at 662:20-23; 663:10-13; *see also* Pennington Rebuttal Ex. 1.  He further testified that Dr. Christians conducted a study in which he found greater emergence of plants from turfgrass cultivars with larger seeds.  Trial Tr. at 663:16-22.  Dr. Karcher opined that the import of the study is that plants with larger seeds will produce more turfgrass plants.  *Id.* at 663:24-664:3.

99.    Pennington's experts also explained that the "seed counts" conducted by Scotts are fatally flawed and demonstrate the unreliability of counting grass seed.  Bruce Caldwell's seed count was flawed because he: (1) counted seed blends, as opposed to straight seed counts, which added variables to his counts, *id.* at 399:15-20; (2) provided no label information about the varieties of seeds in the blends he counted, nor did he run a purity analysis, *id.* at 399:22-400:13;

---

[9]  Scotts pointed to seed counts Mr. Hignight has conducted in attempt to establish that he endorses Scotts' seed counting methodology.  But Mr. Hignight explained the distinction:  He has never counted seeds "for the purpose of labeling" but has counted seeds "in research studies."  *Id.* at 396:17-21.

(3) counted coated seeds, making it impossible to determine whether he actually counted seed or other matter covered in coating, *id.* at 400:14-18; (4) used a mechanical seed counter, which, according to AOSA regulations, is intended for use on much larger seeds, such as soybeans, and provided no evidence that he calibrated his machine for smaller seeds, *id.* at 400:19-401:6; and (5) counted Scotts' Landscaper's Mix (which was uncoated at the time) and did not count a comparable Pennington commodity grade product, *id.* at 590:7-11. Although Mr. Caldwell provided no statistical analysis of his seed counts, Dr. Karcher was able to run a statistical analysis, which showed that Mr. Caldwell's counts could not disprove that the Pennington products do, in fact, have twice the seed ***by number*** as Scotts'. *Id.* at 592:20-593:14. Most of Matthew Levy's seed counts are irrelevant to Pennington's claims regarding Smart Seed and Turf Builder in that he counted different products—1 Step Complete and EZ Seed. *Id.* at 402:16-20. The only count Mr. Levy conducted of the products at issue compared Smart Seed to uncoated Turf Builder Landscaper's Mix, which is no longer sold by Scotts. *Id.* at 402:20-403:2.

### C.      "NO FILLER, TWICE THE SEED" COMPARED TO COATED TURF BUILDER

100.     Apparently realizing the literal truth of Pennington's claims, Scotts also argues that "no filler, twice the seed" compares Smart Seed to both coated and uncoated Turf Builder products. *Id.* at 55:8-17. This argument plainly fails, because all of Pennington's advertisements reference either "filler" or "coated seed products" or both, clearly limiting the comparison to coated Turf Builder products, and not to uncoated products such as Quick Fix. *See*, *e.g.*, Scotts Trial Ex. 256; Scotts Trial Ex. 18. Furthermore, the one Pennington point-of-purchase display that specifically referenced "Scotts' Turf Builder" (as opposed to "coated seed products") is no longer being used. *Id.* at 103:2-10 (Mr. Crow explaining that retailers requested that Pennington

change its point-of-purchase advertising so as not to name specific brands which are also sold in their stores, and that Pennington immediately complied with this request).

101.     Moreover, Mr. Sass testified that Scotts currently sells only one uncoated Turf Builder product, Quick Fix.  *Id.* at 55:12-17.  Both Mr. Sass and Mr. Faust acknowledge that Quick Fix is a commodity-grade product and thus does not compete with premium products such as Smart Seed.  *Id.* at 89:24-90:1; 238:14-2

### D.     NO EVIDENCE SMART SEED "NO FILLER, TWICE THE SEED" CLAIM IS MISLEADING

102.     Scotts has provided ***no*** evidence that Pennington's print advertisements for Smart Seed, informing consumers that Smart Seed has "no filler, twice the seed" as compared to coated seed products, are misleading.  The only survey evidence Scotts has proffered in this case is the Jacoby survey, which tested the claim in Pennington's withdrawn television commercial that Pennington "put[s] in twice as much seed" to 1 Step Complete as compared to EZ Seed.  As explained in Pennington's proposed conclusions of law, this survey must be excluded as irrelevant and scientifically unreliable.  *See infra* ¶¶ 180-201.  At a minimum, the Court should give this survey no weight as a result of its lack of connection to the advertising claims at issue.

### E.     LIFT TEST AND ROOTING ABILITY CLAIMS ARE TRUTHFUL AND NOT MISLEADING

#### 1.  MR. HIGNIGHT'S LIFT TEST WAS SCIENTIFICALLY RELIABLE AND DEMONSTRATES THAT 1 STEP COMPLETE PRODUCES DEEPER ROOTS THAN EZ SEED.

103.     Mr. Hignight explained that the purpose of his lift test was to measure and compare how deeply 1 Step Complete and EZ Seed root into the soil.  Trial Tr. at 404:5-8.  The test is also designed to analyze the separation layer between the product and the soil.  *Id.* at 405:18-406:9.  Mr. Hignight explained that some seeds may germinate in the mulch, and it is important for them to root into the soil as quickly as possible.  *Id.* at 406:2-6.  Thus, the lift test

measures whether the separation layer between the mulch and the soil still exists, or whether the seeds have rooted into the soil and thus can be used by the consumer. *Id.* at 406:6-9.

104.    Dr. Rogers admits that deep rooting is a desirable characteristic for grass plants and that one way to measure whether grass plants have rooted deeply into the soil would be to pull up the blades of grass and see what happened. *Id.* at 340:1-12. He further testified that if grass seed has trouble rooting into the soil because of the composition of the mulch product, it would result in poor and not deep roots. *Id.* at 340:13-17. Dr. Rogers *admits* that the degree to which the mulch in EZ Seed swells could prevent seeds that germinate in the mulch from rooting down into the soil. *Id.* at 292:16-293:2.

105.    Dr. Rogers also acknowledges that if grass seeds have not rooted into the soil, the plants may detach from the soil easily when lifted. *Id.* at 340:17-21. Therefore, he admits, Mr. Hignight's lift test is an accurate way to demonstrate whether grass has rooted deeply into the soil. *Id.* at 340:22-341:1. Dr. Rogers further testified that he agrees with Pennington that vertical tests are common in turfgrass research. *Id.* at 281:22-24.

106.    Mr. Hignight conducted his lift test five times, using 25 replications of each product, for a total of 50 trays of product. *Id.* at 404:16-18. He applied the equivalent of a 1/8-inch layer of the products (applied on a weight basis) to trays filled with two inches of soil. *Id.* at 404:19-23. By applying the product on a weight basis and also weighing the trays, he ensured that the weight of all the trays was equal. *Id.* at 410:24-411:7.

107.    Mr. Hignight watered the products equally throughout the study using a watering control, which was regular seed placed on soil. *Id.* at 404:22-24. Because the standard recommendation for watering seed placed on soil is to keep it moist, the entire test was watered when the soil in the watering control began to dry. *Id.* at 404:24-405:4. Each time the watering

control was watered, the other trays in the test were given the same amount of water. *Id.* at 405:3-8. In order to ensure the same amount of water was applied, Mr. Hignight used a mist nozzle that had been calibrated for a particular rate of water per second and a metronome to count the number of seconds. *Id.* at 408:5-14.

108.    Most of the lift tests were performed after the plants had been growing for four weeks. *Id.* at 405:8-13. The force being applied to each tray when it was lifted was the force of gravity, which is a constant force, times the weight of the trays, which was also equal. *Id.* at 410:3-18. The test was blinded, meaning Mr. Hignight did not know whether he was lifting a 1 Step Complete tray or an EZ Seed tray, *id.* at 486:25-487:11, eliminating any possibility that he was biased in the manner he lifted the trays. Mr. Hignight also testified that he did everything he could to make sure he was lifting the trays in the fairest way possible. *Id.* at 487:24-488:2.

109.    Because Mr. Hignight tested 50 replicates of product, Dr. Karcher was able to conduct a chi square statistical analysis (which requires 30 replicates) of his lift tests. *Id.* at 618:11-21. This analysis revealed that the confidence intervals around the proportion of 1 Step Complete trays that would be expected to successfully lift were typically between 85 and 100 percent, whereas for EZ Seed those intervals for the portion that would lift successfully were between 20 and 35 percent. *Id.* at 618:9-619:4. It further revealed that these differences were significant at the 99 percent confidence interval. *See* Pennington Trial Ex. 66 at 15. In other words, Mr. Hignight explained, "you can be 99 percent [certain] that 1 Step Complete will be more successful at lifting in these trials than EZ Seed." *Id.* at 414:24-415:1.

110.    Dr. Rogers criticized Mr. Hignight's method of applying water in the lift test, so as to keep the products moist. *Id.* at 351:18-23. However, he admits that, in a published article, he opined, "[h]ow much [water] is necessary depends on whether it is hot and dry or if it is

cloudy, or if you have mulched or if your soil is prone to easily drying out.  The possibilities are endless; your abilities to go on autopilot at this point are about the same as when you have a newborn in your house.  You can't."  *Id.* at 350:23-351:5; *see also* Pennington Trial Ex. 14 at 3. Thus, he acknowledged that Mr. Hignight's watering methodology "wouldn't be incorrect" given that he watered in a manner consistent with what Dr. Rogers recommended to consumers in his article.  Trial Tr. at 351:23-352:1.

111.    Dr. Rogers also criticized Mr. Hignight's lift test because of the "subjectivity" involved in how strongly the trays are lifted.  *Id.* at 279:1-5.  Yet, he admitted that, when he offered these opinions at his deposition, he had not bothered to watch the videos of Mr. Hignight's lift tests to observe the manner in which he lifted the trays.  *Id.* at 342:11-13.

## 2. NONE OF SCOTTS' TESTS DEMONSTRATE THAT PENNINGTON'S ROOT DEPTH CLAIMS ARE FALSE.

112.    Mr. Faust and Dr. Rogers also conducted lift tests in attempt to invalidate Mr. Hignight's tests.  Mr. Faust's and Dr. Rogers' lift tests were inherently flawed and biased in that the products were not applied according to the label instructions, 1/8-inch thick.  *Id.* at 620:16-622:1; 417:12-15.  Indeed, as in other Scotts' testing, EZ Seed was applied at nearly double the rate as 1 Step Complete.  *Id.* at 228:3-9 (Mr. Faust admitting that his left tests were conducted using nearly twice the rate of EZ Seed as 1 Step Complete); 416:24-417:7 (Mr. Hignight explaining that Dr. Rogers applied EZ Seed at nearly double the rate as 1 Step Complete in his lift test).  Mr. Faust admitted, again, that this difference in application rate was intended to equalize the seeding rate between the two products, *id.* at 228:3-10, or, in other words, to eliminate any advantage in performance that may result from the fact that 1 Step Complete contains twice the amount of seed as EZ Seed.

113.    In Mr. Faust's lift test, the person lifting the trays was actually blindfolded, meaning, by Mr. Faust's admission, it would have been "difficult" for him to grab in the same spot on the tray each time. *Id.* at 227:20-228:2.

114.    The inconsistent results of Dr. Rogers' and Mr. Faust's lift tests are telling regarding their reliability:  Almost none of the trays in Dr. Rogers' test lifted, while nearly all of the trays in Mr. Faust's test did. *Id.* at 417:19-24.

115.    Dr. Rogers also conducted "shear tests" to measure rooting ability.  He admits that none of these tests were capable of measuring root depth. *Id.* at 343:6-11.

116.    Dr. Rogers testified that his shear tests were designed to test root strength, but Dr. Karcher explained that these tests did not even reliably measure root strength, as they were only able to test the roots at a depth right beneath the surface of the soil. *Id.* at 622:14-21.

117.    Dr. Rogers' statistical test, called a "t" test, found no statistically significant differences in root mass between the two products. *Id.* at 345:13-17.

### 3.  MR. HIGNIGHT'S OTHER ROOT TESTS DEMONSTRATE THAT 1 STEP COMPLETE PRODUCES MORE ROOT MASS THAN EZ SEED.

118.    Mr. Hignight also conducted two other tests to measure rooting ability. *Id.* at 418:1-3.  In one of these studies, "Comparison of the Mulch Products EZ Seed, Rebel Complete, and 1 Step Complete for deep root production," (or "pipe study"), Mr. Hignight filled tubes with silica sand and placed the equivalent of 1/8-inch of product (measured by weight) on top. *Id.* at 418:16-20; 419:1-2; 419:9-12.  After seven weeks, he harvested the roots and weighed them. *Id.* 419:4-7.  The statistical analysis of the results showed that 1 Step Complete produced more root mass, at a 99 percent confidence interval, than EZ Seed. *Id.* at 419:9-11; *see also id.* at 619:5-16.

119.    Mr. Hignight also conducted a test entitled "Evaluation of Root Development of Two Patch Seed Brands" (or "terrarium study"), in which he applied the products on top of seven

inches of sandy loam soil inside terrariums. *Id.* at 419:17-24; 429:24-420:5. The terrariums contained small PVC pipes covered in soil and filled with soil, enabling the roots to grow down into the pipes. *Id.* at 420:6-9. The roots were then harvested and weighed. *Id.* at 420:10-11. The results of this study showed that 1 Step Complete produced more shoot mass and approximately three times more roots than EZ Seed. *Id.* at 420:17-19. This result is apparent from the photographs from this study, in which the roots are visible as "white structures going down the side of the terrarium," and 1 Step Complete has two to three times the amount of roots as EZ Seed. *Id.* at 421:8-14; *see also* Pennington Trial Ex. 48 at Ex. K, 70-81.

### 4. SCOTTS PRESENTED NO EVIDENCE THAT PENNINGTON'S ROOTING ABILITY CLAIMS ARE MISLEADING

120. Scotts had provided *no* evidence that Pennington's root depth claims are misleading. As explained in Pennington's proposed conclusions of law, the Jacoby survey must be excluded as scientifically unreliable, due to the high rate of false positive responses (particularly in response to questions regarding the lift test), as well as the fact that the questions were admittedly flawed. *See infra* ¶¶ 180-201. Moreover, the Jacoby survey is irrelevant to Pennington's rooting ability claims in printed, point-of-purchase advertisements. *Id.* ¶¶ 180-81; 183 .

## PROPOSED CONCLUSIONS OF LAW

## IV.    FALSE ADVERTISING UNDER THE LANHAM ACT

121. Both Scotts and Pennington claim false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See* Pennington's First Amended Complaint for Injunctive and Other Relief ¶ 1; Scotts Trial Ex. 92 at 001.[10]

---

[10] Scotts also pled claims for breach of contract, alleging that Pennington's 2012 Smart Seed label stating "twice the seed! compared to coated seed products" and 2012 display trays stating "twice the seed! vs. Scotts Turf Builder" violate paragraph 1.7(k) of the 2010 Settlement

122. To succeed on a false advertising claim under section 43(a), a movant must establish: (1) the advertising claims of the opposing party were false or misleading; (2) such claims deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been, or is likely to be, injured as a result of the false advertising. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002).

123. The only element at issue is the first,[11] which is satisfied if the challenged claim is "'either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context.'" *PBM Prods.*, 639 F.3d at 120; *Scotts Co.*, 315 F.3d at 273 (internal citations omitted).

## A. LITERAL FALSITY

124. "In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . ., and second, whether those claims are false." *Scotts Co.*, 315 F.3d at 274. A claim can only be literally false if it has an ***unambiguous meaning*** which is not true. *Id.*; *Time Warner Cable, Inc. v. DIRECTV,*

---

Agreement ("Settlement Agreement"). Because these claims are truthful and not misleading, Scotts cannot prevail on its claims under paragraph 1.7(k). *See* Settlement Agreement at 1.7(k) ("Pennington can state, if truthful and accurate, that Smart Seed packages contain more grass seed per pound than [Turf Builder with Water Smart] packages. . . ."). Scotts also originally pled breach of contract claims based on certain Pennington webpages, *see*, *e.g.*, Scotts' Trial Ex. 13, but all such webpages have been withdrawn by stipulation, rendering Scotts' claims in regard to them moot. *See* Pennington's Paragraph 7 Notice ¶¶ 1, 3, 4, 5 & Ex. A, C, D, E.

[11] The parties have stipulated that "all challenged advertising claims are material" and that "the use of any challenged advertising claim that the Court finds to be false or misleading . . . caused irreparable harm to the challenging party." May 3, 2013 Revised Corrected Stipulation ¶ 3. The parties have also "waive[d] all claims to money damages" and "consent to entry of a permanent injunction against . . .any advertising claim that the Court finds false or misleading. . . ." *Id.*

*Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement ***cannot be*** literally false.") (emphasis added). Thus, literal falsity is shown only where the challenged claim is unambiguous and facially false.

125.    Where an advertisement relies on test data to support its claims—i.e., establishment or "tests show" claims—a plaintiff alleging literal falsity need only show either (i) that the tests were not sufficiently reliable to permit the conclusion for which they are cited, or (ii) that the tests, even if reliable, do not establish the proposition asserted by the defendant.  *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*,131 F.3d 430, 435 (4th Cir. 1997) (internal citation omitted); *SC Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 765 (E.D.N.Y. 1996).  An assertion that an advertisement is study-verified may be either express or implied.  *C.B. Fleet Co., Inc.*, 131 F.3d at 435.  Scotts admits that its claims regarding superior water absorption and retention are establishment claims.  *See* Trial Tr. at 65:14-17 ("Q. Now, what's the basis for the statement that EZ Seed absorbs more water than Pennington's 1 Step, the mulch in EZ Seed?  A. That's been validated through Scotts' R&D.")

126.    A claim may be false when it is based on test conditions that are detached from how the product is used in the real world.  *See*, *e.g.*, *SC Johnson & Son, Inc.*, 930 F. Supp. at 765-67 (advertising claim false where it was based on tests that did not measure how the product would work when used by consumers in their homes following product labels); *see also Castrol Inc. v. Quaker State Corp.*, 169 F. Supp. 2d 332, 338  (D.N.J. 2001) (enjoining advertising claim where product testing "is not relevant to the consumer [and] does not simulate real-world driving conditions"); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 129 F. Supp. 2d 351, 360-61 (D.N.J. 2000) (claim of superior performance by drug false where there was no proven correlation between laboratory testing and efficacy in

40

the body); *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.,* 873 F. Supp. 893, 904 (D.N.J. 1994) (where defendant claimed its product "absorbs odors five times better than baking soda" and did "not inform consumers that this claimed superiority is based solely on laboratory testing," "that defendant's claimed superiority is true in a laboratory setting, does not rescue it from literal falsity should this Court conclude that the laboratory claim has no practical equivalent in the real world").

127.    Similarly, testing can only prove that an advertising claim is false if it replicates real world application of the product. *See, e.g., Playtex Products, Inc. v. Procter & Gamble Co.,* 2004 WL 1658377, at *4 (S.D.N.Y. July 26, 2004) (asserting, "[u]nder the Lanham Act, product testing can prove an advertising claim false or misleading only if those tests have some 'real world' applicability," and noting the jury was instructed that "[a]s a general rule, product tests should attempt to replicate how the consumer uses the product in real life as much as possible").

## B.  IMPLIED FALSITY

128.    "A Lanham Act plaintiff asserting an implied falsehood claim must establish that the advertising tends to deceive or mislead a **substantial portion** of the intended audience." *PBM Prods., Inc.,* 639 F.3d at 123 (quoting *Scotts Co.,* 315 F.3d at 280) (emphasis added); *see also Scotts Co.,* 315 F.3d at 280 (finding that implied falsity requires that proof that a "substantial number" of consumers are being misled by the challenged advertisement).

129.    "[T]he Lanham Act protects against **misleading** and false statements of fact, not **misunderstood** statements." *Am. Italian Pasta Co. v. New World Pasta Co.,* 371 F.3d 387, 394 (8th Cir. 2004) (emphasis added); *see also Haymond v. Lundy,* 2001 WL 15956, at *4 (E.D. Pa. Jan. 5, 2001) ("The Lanham Act makes misleading statements actionable, but a misunderstood statement is not the same as a misleading one."). Courts recognize that "interpreting

41

'misleading' to include factual propositions that are susceptible to misunderstanding would make consumers as a whole worse off by suppressing truthful statements that will help many of them find superior products. . . . 'Misleading' is not a synonym for 'misunderstood. . . .'" *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000).

130.    "[I]f a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [representations] tend to mislead or confuse consumers." *PBM Prods., Inc*., 639 F.3d at 120. (citations omitted); *see also PBM Prods., LLC*, 2009 WL 1684471, at *3 (holding that plaintiff failed to demonstrate that defendant's advertising campaign was misleading where it offered nothing more than its "own convictions" to establish consumer confusion).

131.    Extrinsic evidence is "typically shown by the use of consumer surveys." *PBM Prods., Inc*., 639 F.3d at 123. Thus, "the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." *Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992).

132.    As the Fourth Circuit noted, "[t]he evidentiary value of a survey depends on its underlying objectivity." *Scotts Co.*, 315 F.3d at 278 (citation omitted). "This objectivity, in turn, depends upon many factors, such as whether the survey is properly filtered to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *Id.* (quoting *Johnson & Johnson-Merck*, 960 F.2d 294, 300 (2d Cir. 1992)).

133.    To this end, courts favor open-ended questions in consumer surveys, and view them as having greater objectivity and probative value compared to close-ended questions. *See*, *e.g.*, *Gillette v. Norelco*, 69 F. Supp. 2d 246, 259-60 (D. Mass. 1999) (quoting Jacob Jacoby, et

al., Survey Evidence in Deceptive Advertising Cases Under the Lanham Act: An Historical Review of Comments From the Bench, 84 The Trademark Reporter 541, 561 (1994)) ("'[A]ided [or closed-ended] questions have often been criticized in deceptive advertising actions" and "'unaided [or open-ended] questions have been praised because they do not force an unnatural degree of attention on a test stimulus.'"); *see also Johnson & Johnson-Merck Consumer Pharma. Co. v. Smithkline Beecham Corp.*, 1991 WL 206312, at *8 (S.D.N.Y. Oct. 1, 1991) (finding responses to "open-ended questions the most persuasive evidence of the message communicated," and concluding that the survey failed to show that the challenged advertisement misled or confused consumers), *aff'd*, 960 F.2d 294 (2d Cir. 1992).

134. A survey can only provide proof of implied falsity where it accounts for the actual allegations in the case. *See PBM Prods, LLC*, 639 F.3d at 122. Thus, in *PBM Prods.*, the Fourth Circuit held that the defendant's consumer survey could not support its counterclaim of implied falsity, where defendant alleged that plaintiff's comparative advertisements implied that plaintiff's product was identical to defendant's, yet defendant's consumer survey assumed that respondents who said the two products were the "same" meant they were "identical." *Id.* Because the district court concluded that the parties' products were the same, but not identical, the Fourth Circuit held that the survey failed to account for the actual allegations in the case and thus could not support defendant's counterclaim. *Id.*

135. Courts generally agree that consumer deception is shown through surveys where the challenged advertisement has a deception rate of 15 percent. *See, e.g.*, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharma. Co.*, 290 F.3d 578, 594 (3d Cir. 2002) (finding that 15 percent consumer confusion or deception is sufficient to establish actual deception); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996) (holding that

15 percent was a "significant degree" of actual confusion).  Dr. Jacoby acknowledges 15 percent

as the standard used by courts for establishing consumer deception.  P.I. H'rg Tr. at 279:7-280:1.

136.    Although 15 percent is the typical threshold for deception, Dr. Jacoby admits that

"15 percent is a quantitative number that different courts interpret qualitatively.  Some will find

results below that actionable.  Some will find it requires results above that actionable. . . . it's

not, you know, a fixed number."   6/4/2013 Videotaped Deposition of Jacob Jacoby, Ph.D.

("Jacoby Dep.") at 124:9-14; *see also* Trial Tr. at 843:19-21 (Dr. Ford explaining that each court

can make its own decision in regard to the threshold necessary to find an advertisement

deceptive or misleading).  Indeed, Dr. Jacoby acknowledges that he wrote in an article that "[t]he

lowest percentages considered substantial enough to justify a Lanham Act claim have been stated

by various courts as 15 percent, 20 percent, and 22 percent, but reliance on particular percentage

is tenuous at best. . . . As the court observed in *Coca-Cola*, 'an advertisement's tendency to

mislead need not be established by any minimum percentage of confused consumers.  The

requisite proof is qualitative, not quantitative.'"  Jacoby Dep. at 289:12-25.  In other words, the

quantitative level of deception required is driven by the court's qualitative assessment regarding

the survey, i.e., a low-quality survey utilizing biased and leading questions will require a higher

level of quantitative deception.  Dr. Jacoby further testified, "I would say most courts rely on a

quantitative number.  They come up with impression.  I think it's a combination of both."  *Id.* at

290:9-12.

## V.    ADMISSIBILITY AND WEIGHT OF EXPERT TESTIMONY

137.    Under Rule 702 and *Daubert*, expert testimony must be "the product of reliable

principles and methods," and the witness must have "applied the principles and methods reliably

to the facts of the case."  FED. R. EVID. 702; *see also Daubert*, 509 U.S. at 592-93 (the court must

assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue").

138.    When there is an objection to expert testimony, the proponent of expert testimony has the burden of establishing admissibility by a preponderance of the evidence. *ActiveVideo Networks, Inc. v. Verizon Commcns, Inc.*, 2011 WL 7036049, at *2 (E.D. Va. July 15, 2011) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Galaxy Computer Servs, Inc. v. Baker*, 325 B.R. 544, 560 (E.D. Va. 2005) (same) (citing *Daubert*, 509 U.S. at 592).

139.    Under *Daubert*, courts should consider five factors in assessing the reliability of expert testimony: "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 F. App'x 612, 618 (4th Cir. 2011) (citations omitted); *see also Sanders v. UDR, Inc.*, 2011 WL 864336, at *6 (E.D. Va. Mar. 10, 2011) (same); *United States v. Engle*, 2010 WL 3989155, at *1 (E.D. Va. Oct. 8, 2010) (same).

140.    "One very significant fact" to be considered when assessing the reliability and admissibility of expert testimony "is whether the expert[] [is] proposing to testify about matters growing naturally and directly out of research [he] ha[s] conducted independent of the litigation, or whether [he] ha[s] developed [his] opinions expressly for purposes of testifying." *Daubert v. Merrill Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); *see also Davis v. Old Dominion Tobacco Co., Inc.*, 2010 WL 8945996, at n.2 (E.D. Va. Nov. 5, 2010) (noting that

the Advisory Committee's notes to the 2000 Amendments to Rule 702 state that an additional relevant factor in determining the admissibility of expert testimony is "whether the expert is proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation"); *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (one of the abuses at which *Daubert* and its progeny are aimed is "the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit").  Thus, when a proposed expert "is a 'quintessential expert for hire,' then it seems well within a trial judge's discretion to apply the *Daubert* factors with greater rigor."  *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) (citation omitted).

141.   The court must also consider the "fit" between the facts and the expert's conclusions to ensure there is not "too great an analytical gap between the data and the opinion offered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011).   In other words, there must be a demonstrable connection between the facts and the opinions, and the expert's reasoning and methodology must be properly applied to the facts.  *Daubert*, 509 U.S. at 592-93.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146; *see also East West, LLC v. Rahman*, 2012 WL 4105128, at *4 (E.D. Va. Sept. 27, 2012).  An expert who provides "no reliable link between his data and the facts at issue in the case," *Phillips v. Am. Honda*, 238 F. App'x 537, 540 & n.2 (11th Cir. 2007), or whose opinion is not "'connect[ed] to the pertinent inquiry . . . should be excluded because there is no 'fit.'"  *Boca*

*Raton Comm. Hosp. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232-33 (11th Cir. 2009); *see also McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 F. App'x 789, 791-92 (4th Cir. 2010) (affirming exclusion of testimony connected to the existing data only by the *ipse dixit* of the experts); *ePlus, Inc.*, 764 F. Supp. 2d at 812 (discussing *Daubert*'s "fit" requirement).

142.    Under *Daubert*, "[a]n expert cannot simply parrot his client's findings or calculations and then pass that data off as his own expert opinion." *Capital Concepts, Inc. v. Mountain Corp.*, 2013 WL 1319348, at *8 (W.D. Va. Mar. 29 2013).   The Fourth Circuit has also held that, "as several courts have observed, it is important to the proper cross-examination of an expert witness that the adverse party be aware of the facts underlying the expert's opinions, including whether the expert made an independent evaluation of those facts, or whether he instead adopted the opinions of the lawyers that retained him." *Elm Grove Coal Co. v. Director*, O.W.C.P., 480 F.3d 278, 301 (4th Cir. 2007) (collecting cases); *see also Mack v. AmerisourceBergen Drug Corp.*, 671 F. Supp. 2d 706, 712 (D. Md. 2009) ("[E]ven when it is deemed admissible, expert testimony that has been influenced by a hiring attorney is often afforded less deference by a fact-finder"); *Musselman v. Phillips*, 176 F.R.D. 194, 200 (D. Md. 1997) ("It cannot seriously be denied that the fact that an attorney has interjected him or herself into the process by which a testifying expert forms the opinions to be testified to at trial affects the weight which the expert's testimony deserves."); *Occulto v. Adamar of New Jersey, Inc.*, 125 F.R.D. 611, 615-16 (D.N.J. 1989) ("an expert who can be shown to have adopted the attorney's opinion as his own stands less tall . . . than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion").

143.    Similarly, an expert cannot act "as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some

specialized factual situation." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (holding that expert cannot give opinion that is "just parroting the opinion of [another] expert"); *Insight Technology, Inc. v. SureFire*, LLC, 2007 WL 3244092, at *8 (D.N.H. Nov. 1, 2007) ("[A] disclosed expert cannot provide the opinions of another non-disclosed expert."

## VI. PENNINGTON HAS SHOWN THAT SCOTTS' SUPERIORITY CLAIMS ARE LITERALLY FALSE AND MISLEADING.

### A. MR. FAUST'S TESTS AND OPINIONS CANNOT SUPPORT SCOTTS' CLAIMS.

144.    Mr. Faust's testing and resultant opinions must be excluded under Rule 702 and *Daubert* as scientifically unreliable and lacking the requisite fit to the facts of this case.  *See Daubert*, 509 U.S. at 592-93.  These tests also cannot support Scotts' establishment claims, because they are both scientifically unreliable and do not establish the propositions for which they are cited.  *C.B. Fleet Co.*, 131 F.3d at 435.

145.    Mr. Faust admits that his tests did not replicate how the products are used by consumers in that he did not test the products on soil.  Trial Tr. at 218:14-23.  In fact, he admits that, because he did not conduct any tests on soil, he has no empirical data regarding whether EZ Seed holds or retains water in a superior manner as compared to 1 Step Complete when the products are used as intended, on soil.  *Id.* at 220:13-17.  Mr. Faust further admits that his tests did not replicate consumer experience in that he conducted his trials by soaking EZ Seed and 1 Step Complete in a water bath, as opposed to irrigating them from above, as the consumer would.  *Id.* at 219:4-11.  As such, Mr. Faust's tests and related opinions must be excluded because they do not fit the facts of the case.  *See*, *e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011).  Moreover, even if admissible, Mr. Faust's testing cannot support Scotts' superiority claims.  *See*,

*e.g.*, *SC Johnson & Son, Inc.*, 930 F. Supp. at 765-67 (testing did not substantiate claims of superior performance because it "interject[ed] an entirely unrealistic element as compared to how these products are applied in the real world"); *see also* Trial Tr. at 86:17-87:1 (Mr. Sass acknowledging that it is inappropriate to test products in a medium the consumer would never use and make claims based on these tests, because it would be misleading).

146.   In some of Mr. Faust's tests, EZ Seed was applied at double the rate as 1 Step Complete.  Trial Tr. at 598:5-14.  Mr. Faust ***admits*** that this was done to account for the fact that 1 Step Complete contains more seed by weight than EZ Seed.  *Id.* at 216:7-15; *see also id.* at 249:13-16 ("Due to the differences in the formulation of the products, our bare spot rate, the 1.875 pound rate, it essentially standardizes the seeding rate of the two products.")  He further admits that when equal amounts of product are applied, there was no statistically significant difference in the performance of EZ Seed and 1 Step Complete.  *See*, *e.g.*, Trial Tr. at 215:22-216:1; 216:16-25.  Thus, Mr. Faust's tests cannot support Scotts' superiority claims because his test results actually ***refute*** these claims.  *See Star-Brite Distributing, Inc. v. Kop-Coat, Inc.*, 664 F. Supp. 2d 1246, 1254 (S.D. Fla.) (enjoining claim when tests relied upon did not support superiority claim).

147.   Mr. Faust also concedes that the "application rates" he used in his testing appear nowhere on the EZ Seed package, *id.* at 228:12-22, and that, at the time he conducted his tests, the EZ Seed label said to apply the product 1/8 inch thick.  *Id.* at 204:1-5.  He further concedes that this label instruction was intended to deliver to consumers "a clear message on how to apply the product."  *Id.* at 164:15-22.  He also admits that the fairest way to test products would be according to the way consumers would use them if they were following the package directions. *Id.* at 244:3-7.  Mr. Faust's failure to follow label instructions in testing the products further

49

demonstrates that his testing cannot support Scotts' superiority claims.  *See*, *e.g.*, *SC Johnson & Son, Inc.*, 930 F. Supp. at 766-67 (testing for product to treat roach infestation did not support superiority claims because the number of baits used in product testing was "completely inconsistent with product label directions," and "nothing on the label even remotely suggests that consumers should place multiple baits at each location where baits are placed," as the company did in its testing).

148.    Dr. Karcher's analysis of the standard deviation values Mr. Faust provided with his tests revealed that these tests had a very high rate of experimental error.  *Id.* at 602:23-603:6. As such, these tests should be excluded, or at a minimum, given little weight, under *Daubert* and Rule 702.  *See*, *e.g.*, *Peters-Martin*, 410 F. App'x at 618 (known or potential rate of error is one factor to be considered in determining the reliability of expert testimony under *Daubert*).

149.    Ultimately, Mr. Faust's testing was unreliable, biased, and fails to establish EZ Seed's superiority over 1 Step Complete.  *See C.B. Fleet Co., Inc.*, 131 F.3d at 435.

### B. MR. HIGNIGHT'S TESTS FURTHER DEMONSTRATE THAT SCOTTS' CLAIMS ARE FALSE.

150.    The results of Mr. Hignight's tests, which treated the products fairly and attempted to replicate real-world conditions, further demonstrate that Scotts' superiority claims are false.  *See*, *e.g.*, 603:19-25 (Dr. Karcher testifying that the results of Mr. Hignight's tests, which were conducted applying equal amounts of product, on soil, revealed that 1 Step Complete retains significantly more water than EZ Seed).

151.    Mr. Hignight's water retention tests all used equal amounts of product and applied equal amounts of water to them, in order to treat the products fairly and to limit variables.  *Id.* at 367:1-11.

152. Mr. Hignight applied water to the products from above in all his tests, in order to replicate consumer usage. *See*, *e.g.*, *id.* at 365:1-23 (water retention tests conducted by adding water to the products from above, in droplet form).

153. Mr. Hignight also tested the water retention of the products when applied on soil in his "beaker studies." *Id.* at 374:23-25. Scotts' own experts admitted that these tests replicated consumer usage because they were conducted on soil. *Id.* at 524:8-11 (Dr. Hummel admitting that Mr. Hignight's tests reflect consumer usage in that consumers will put the product on soil).

154. Although Scotts' experts criticized Mr. Hignight for applying the products on a depth basis in his testing, *see*, *e.g.*, *id.* at 267:16-122, they ***admit*** that this methodology has been subjected to peer review and publication. *See*, *e.g.*, *id.* at 333:10-17 (Dr. Rogers admitting that he applied mulches on a depth basis in a peer-reviewed article); 239:12-240:13; 241:8-10 (Mr. Faust acknowledging that Dr. Rogers applied mulch products on a depth basis in a peer-reviewed article and asserting that he does not criticize Dr. Rogers for having conducted his experiment in this manner); *Peters-Martin*, 410 F. App'x at 618 (whether an expert's theory has been subjected to peer review and is an indicia of reliability under *Daubert*).

155. Dr. Karcher's analysis of Mr. Hignight's tests revealed coefficient values that were all less than 5 percent, meaning Mr. Hignight's tests, in contrast to Mr. Faust's, had an acceptable level of experimental error. *Id.* at 603:7-11; 604:15-19; *see also Peters-Martin*, 410 F. App'x at 618 (known rate of error an indicia of reliability under *Daubert*).

156. The results of Mr. Hignight's "2012 Comparison of Two Seed Mulch Products for Water Retention" study revealed that when EZ Seed had lost 75 percent of its water, 1 Step Complete retained 20.7 percent more water. *Id.* at 366:20-25. The statistical analysis of Mr. Hignight's beaker studies, conducted on soil, showed that when the products were applied 1/8-

inch thick, when EZ Seed had lost 65 percent of its water, 1 Step Complete had retained 40.5 percent more water.  *Id.* at 381:9-14.  Because Mr. Hignight's tests replicate real-world usage of the products, and were conducted in a scientifically reliable manner, these tests demonstrate that Scotts' claims are false.  *See*, *e.g.*, *Playtex Products, Inc.*, 2004 WL 1658377, at *4 (product testing can prove an advertising claim false or misleading only if those tests have some 'real world' applicability"); *see also Peters-Martin*, 410 F. App'x at 618 (indicia of reliability of expert testimony under *Daubert* include known rate of error and subjection to peer review and publication).

## C.  DRS. ROGERS' AND HUMMEL'S TESTIMONY CANNOT SALVAGE SCOTTS' CLAIMS.

### 1.  Drs. Rogers' and Hummel's Opinions Must Be Excluded as Scientifically Unreliable.

157.    Dr. Hummel admits that the product application rate he used was not the same rate he would have used if he had conducted his testing outside of litigation, without any instruction from Scotts' counsel.  Trial Tr. at 575:19-576:3; Hummel Dep. at 131:17-20. Because Dr. Hummel admits that his testing was developed expressly for the purpose of litigation and did not replicate testing he would have conducted outside the litigation context, his opinions regarding these tests must be excluded as scientifically unreliable under *Daubert* and Rule 702.  *See Davis*, 2010 WL 8945996, at n.2; *Daubert II*, 43 F.3d at 1317.

158.    Dr. Hummel similarly admits that he used the application rates he did simply because they were the rates used by Dr. Rogers, and because he was instructed to do so by Scotts' counsel.  *Id.* at 561:14-21.  He also admits that he did not independently verify that these rates were appropriate.  *Id.* at 574:1-7.  This further demonstrates that Dr. Hummel's opinions must be excluded under *Daubert*, *see Capital Concepts, Inc. v. Mountain Corp.*, 2013 WL

1319348, at *8 (W.D. Va. Mar. 29 2013), or, at a minimum, given little weight by this Court. *See*, *e.g.*, *Elm Grove Coal Co.*, 480 F.3d at 301; *Mack*, 671 F. Supp. 2d at 712.

159.    Like Dr. Hummel, Dr. Rogers admits that the product application rate used in his testing—and his testimony regarding product application—do not mirror testing he has conducted and opinions he has offered outside the context of litigation.  Dr. Rogers admits that in a published article, he opined that mulch should be applied so as to form a protective layer over the soil, Trial Tr. at 327:9-18; *see also* Pennington Trial Ex. 15 at 2, and that in testing he conducted for another published article, he applied mulch products so as to form an even layer over the soil.  Trial Tr. at 330:18-331:24; *see also* Pennington Trial Ex. 16 at 3.  He further admits that in his publications on mulches, he has never opined outside the litigation context that mulches should be applied at only 50 to 75 percent coverage over the soil.  Trial Tr. at 334:13-16.  Yet, in the context of litigation, Dr. Rogers conducted testing where did not apply mulches so as to achieve a complete layer over the soil, *see id.* at 329:2-6, and opines that mulches should only be applied at a 50 to 75 percent coverage rate.  *Id.* at 277:5-8.  Such scientifically unreliable opinions must be excluded under *Daubert* and Rule 702.  *See*, *e.g.*, *Daubert II*, 43 F.3d at 1317 (court must consider "whether the expert[] [is] proposing to testify about matters growing naturally and directly out of research [he] ha[s] conducted independent of the litigation, or whether [he] ha[s] developed [his] opinions expressly for purposes of testifying"); *see also Davis v. Old Dominion Tobacco Co., Inc.*, 2010 WL 8945996, at n.2 (E.D. Va. Nov. 5, 2010).

160.    Dr. Rogers' critique of Mr. Hignight's product application rate as scientifically unreliable, *see*, *e.g.*, Trial Tr. at 333:10-17, must likewise be excluded, in light of the fact that Mr. Hignight's methodology mirrors peer-reviewed, published testing Dr. Rogers himself has conducted outside of litigation.  *See*, *e.g.*, *id.* at 330:18-331:24.

### 2. Drs. Rogers' and Hummel's Opinions Must Be Excluded for Lack of Fit.

161.    Drs. Rogers and Hummel both admit that their testing lacks fit to the facts of this case and has limited real-world applicability.  Dr. Hummel admits that he is "sure" that the consumer is not going to replicate his weight-based product application rate.  *Id.* at 574:19-23.  Dr. Rogers similarly acknowledges that a consumer would have to have "strong math skills" in order to replicate his product application methodology.  *Id.* at 323:8-11.

162.    Dr. Hummel further acknowledges that his tests do not replicate consumer use of the products in that he did not conduct his testing on soil, *id.* at 524:20-22, and that he saturated the products in a water bath as opposed to irrigating them from above.  *Id.* at 553:2-10.

163.    In light of these admissions, Drs. Rogers' and Hummel's opinions regarding their product testing must be excluded under Rule 702 and *Daubert* as lacking the requisite fit to the facts of the case.  *See*, *e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011).  At a minimum these opinions must be given little weight under the Lanham Act as inapplicable to real-world usage of the products.  *See*, *e.g.*, *SC Johnson & Son, Inc.*, 930 F. Supp. at 765-67.

### D.  THE MARONICK SURVEY PROVES THAT SCOTTS' CLAIMS ARE MISLEADING.

164.    Dr. Maronick exclusively relied on non-leading open-ended questions to establish that Scotts' superiority claims mislead and deceive consumers.  Trial Tr. at 776:12-21.  As Dr. Ford explained, "open-ended questions are generally considered to be the more important of questions in a litigation survey because well-crafted open-ended questions do not lead the consumer to, or the respondent, to think about things they wouldn't have thought about without the prompting associated with the question."  *Id.* at 810:14-21.  Dr. Jacoby likewise agrees that open-ended questions are preferable to closed-ended questions in that they eliminate the possibility that the question influenced the answer.  *Id.* at 734:25-735:5; *see also Scotts Co.*, 315

F.3d at 278 ("The evidentiary value of a survey depends on its underlying objectivity" which in turn depends in part upon "whether the questions are leading or suggestive").

165.    Based on responses to open-ended questions, the Maronick survey revealed that 42 percent of respondents in the test group came away with the false impression that EZ Seed is superior to 1 Step Complete.  *Id.* at 777:25-778:6.

166.    In the end, after subtracting the control, Dr. Maronick reported a deception rate of 24.3 percent, *id.* at 778:13-17, which well-exceeds the threshold 15 percent most courts use to establish consumer deception.  *See Sara Lee Corp.*, 81 F.3d at 467.  Therefore, the results of the Maronick Survey are sufficient to establish that Scotts' false superiority claims mislead a substantial number of consumers.

167.    Scotts' critique that Dr. Maronick cannot separate out the impact of the "ground-up paper" claims from the "holds and retains water better than paper," *see*, *e.g.*, Trial Tr. at 785:13-16, should be disregarded in light of Mr. Sass's concessions that these claims convey the message that the mulch in EZ Seed "does perform better than Pennington's mulch," *id.* at 78:19-24, and that the mulch in EZ Seed "is better than Pennington's mulch."  *Id.* at 79:6-12.

168.    Indeed, courts have relied upon witness testimony—particularly admissions from party witnesses—regarding the intended meaning of an advertisement in finding the advertisement false or misleading.  *See*, *e.g.*, *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 906 F. Supp. 178, 187-88 (S.D.N.Y. 1995) (relying on testimony from party's marketing director regarding the intended message of a challenged advertisement and finding that message to be false and enjoining claim); *Am. Home Prods. Corp. v. Abbott Labs.*, 522 F. Supp. 1035, 1038 (S.D.N.Y. 1981) ("Defendant's own witness . . . testified that the overall message of the television commercials is, as it was intended

to be, that [defendant's product] is superior to [plaintiff's product].  The survey conducted for [plaintiff] to test the television commercials . . . overwhelmingly supports this proposition. . . . Thus, the three statements that [plaintiff] challenges all contribute to the message of [defendant's product's] superiority. . . .").

## VII.  SCOTTS HAS FAILED TO SHOW THAT PENNINGTON'S CLAIMS ARE FALSE OR MISLEADING.

### A.  SCOTTS HAS FAILED TO SHOW THAT PENNINGTON'S SMART SEED "NO FILLER, TWICE THE SEED" CLAIMS ARE LITERALLY FALSE.

169.    The undisputed evidence shows that Pennington's Smart Seed contains twice as much seed by weight as Scotts' coated Turf Builder, and that seed products are sold to consumers by weight, not seed count.  Trial Tr. at 205:8-12; 82:8-11.  In fact, Mr. Faust testified that Pennington's "twice the seed" claims are "literally true" on a weight basis.  *Id.* at 205:8-15.

170.    Federal and state laws and regulations and industry standards require that grass seed to be labeled and sold on a weight basis.  *Id.* at 82:8-11.  In addition, the industry standard has always been to measure grass seed by weight, not seed count.  *Id.* at 395:24-396:4; *see also Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 365-66 (S.D. Fla. 1996)  ("In making a threshold determination concerning the falsity of a challenged advertisement under the Lanham Act, examining the industry standard is appropriate.") (citation omitted).

171.    The absence of "compared to coated seed products" from Pennington's (no longer in use) 2012 display trays does render its claim false in light of the fact that these trays clearly limit the comparison to products containing "filler."  *See* Scotts Trial Ex. 18.  Furthermore, both parties agree Smart Seed competes against Scotts' coated Turf Builder products, and not against uncoated commodity-grade seed such as Quick Fix.  *Id.* at 95:16-21; 238:14-21.  Moreover, these display trays are no longer being used.  *Id.* at 103:2-10.

172.    Scotts' seed counts cannot salvage its claims.  *First*, the Court must exclude the testimony from Scotts' experts regarding these seed counts in light of the fact that it was merely a conduit for testimonial hearsay—namely, the opinions of Mr. Caldwell and Mr. Levy regarding these seed counts.  *See Johnson*, 587 F.3d at 635 (expert cannot act "as little more than a conduit or transmitter for testimonial hearsay"); *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 614 (expert cannot give opinion "just parroting the opinion of [another] expert"; *Insight Tech., Inc.*, 2007 WL 3244092, at *8 (expert cannot "provide the opinions of another non-disclosed expert").

173.    *Second*, Scotts' seed counts must be excluded as unreliable in light of testimony from both Pennington's and Scotts' experts that such seed counts are not generally accepted in the turfgrass science community.  Trial Tr. at 587:24-588:9 (Dr. Karcher explaining that it would make little sense from an agronomic perspective to count the number of seeds in a bag and that it would be very difficult to do so); 396:12-17 (Mr. Hignight opining that it would be "impossible" to count the number of seeds in a bag for the purpose of product labeling); 142:8-16 (Mr. Faust acknowledging that although he conducts seed counts in research, he has never outside the context of litigation conducted a seed count "to the magnitude [he was] asked for this particular case"); *United States v. Engle*, 2010 WL 3989155, at *2 (excluding expert testimony where there was no indication that expert's opinion was accepted by his peers in the mortgage lending community).  Moreover, Dr. Karcher explained that Mr. Caldwell included an exhibit of the species of seed in each of the products he tests, as well as expected minimum and maximum numbers of seeds that should have been in each bag of product based on published seed counts for those species, but that only five products he tested fell within his expected ranges.  Trial Tr. at 590:11-24.  This led Dr. Karcher to conclude that there was likely a high rate of error in Mr. Caldwell's counts, due to the difficulty of counting grass seeds and that fact that seed-counting

equipment is not intended to be used for seeds so small.  *Id.* at 590:23-591:1 *Peters-Martin*, 410

F. App'x at 618 (indicia of reliability under *Daubert* is the known or potential rate of error of a

methodology).

174.    Accordingly, Scotts has failed to show that Pennington's Smart Seed "no filler,

twice the seed" claims are literally and unambiguously false.   Indeed, at the preliminary

injunction stage, this Court held, "Pennington's evidence showed that its 'twice the seed' claims

are literally true on a weight basis, which Pennington claims is the industry standard to measure

seed count."  11/30/2012 Memorandum Opinion (Dkt. 109) at 8.

### B. Scotts has Failed to Show that Pennington's Lift Test and Rooting Claims are Literally False.

175.    Mr. Hignight's lift test was conducted in a scientifically reliable manner and

demonstrates that 1 Step Complete produces deeper rooting than EZ Seed.  *See*, *e.g.*, *id.* at 618:9-

619:4 (Dr. Karcher explaining that the statistical analysis of Mr. Hignight's lift tests revealed that

the probability of a successful lift of the 1 Step Complete trays was typically between 85 and 100

percent, as compared to 20 and 35 percent for EZ Seed); 414:17-415:1 (Mr. Hignight explaining

that these differences were significant at a 99 percent confidence interval).

176.    In contrast, Dr. Rogers' and Mr. Faust's lift tests were conducted using double the

amount of EZ Seed as compared to 1 Step Complete, *id.* 228:3-9; 416:24-417:7, and did not

produce reliable or informative results.  *Id.* at 417:19-24.

177.    Moreover, because these tests ignored label instructions to apply the products 1/8-

inch thick, they cannot prove Pennington's claims false.  *See id.* at 417:12-15; 620:16-622:1; *see*

*also Playtex Prods., Inc. v. Procter & Gamble Co.*, 2004 WL 1658377, at *4 ("product testing

can prove an advertising claim false or misleading only if those tests have some 'real world'

applicability"); *SC Johnson & Son, Inc.*, 930 F. Supp. at 765-67 (testing did not reflect consumer use of the product where label instructions regarding product application were not followed).

178.    Dr. Rogers' root strength tests are inapplicable to the claims at issue.  *See* Scotts Trial Ex. 92 ¶ 54 (Pennington point-of-purchase advertisement claiming that the mulch in 1 Step Complete drives "deep, healthy roots").  Dr. Rogers admits none of his tests measured root depth.  *Id.* at 343:6-11; 343-344:15-4; *see also Castrol Inc.*, 1992 WL 47981, at *8 (S.D.N.Y.) ("On the question of tests proving that [product] protects better against engine wear, one may put aside without hesitation . . . tests [that] dealt only with oiling time.").  Moreover, Dr. Karcher explained that Dr. Rogers' shear tests did not even measure root strength.  Trial Tr. at 622:14-21.

179.    Pennington's commercial depicting the lift test (to the extent it is still at issue) and display trays advertising deep, healthy roots are therefore truthful and accurate.

## C.    THE JACOBY SURVEY MUST BE EXCLUDED

### 1.    The Jacoby Survey Must be Excluded for Lack of Fit

180.    Dr. Jacoby performed his survey using a 2012 television commercial for 1 Step Complete that has been withdrawn pursuant to stipulation.  *See* Pennington's Paragraph 7 Notice ¶ 10.  Dr. Jacoby admits that the crucial elements tested were both the phrase "we put in twice as much seed" and the image of seed running through an actor's hands.  Trial Tr. at 718:25-719:6.

181.    The advertising at issue is labels and point-of-purchase materials stating, "no filler, twice the seed."  Dr. Jacoby admits he has only a "hypothesis" that his survey results apply to this advertising.  *Id.* at 721:5-13.  He further admits he has no empirical evidence to support this hypothesis.  *Id.* at 729:9-13.

182.    Specifically, Dr. Jacoby admits that he cannot parse out what impact the words "we put in twice as much seed" had on his respondents as compared to the image of the seed

rolling through the actor's hands.  *Id.* at 720:17-721:2.  He also admits that the crucial words "no filler," which appear in all Smart Seed print advertisements, do not appear in the commercial, nor does the phrase "twice the seed."  *Id.* at 724:6-725:13.  Indeed, he admits he would need to conduct additional testing to determine what message consumers take away from Pennington's "twice the seed" print advertising.  *Id.* at 726:5-12.

183.    The "lift test" questions in the Jacoby survey also lack proper fit to the advertising at issue, given that the commercial containing the lift test has been withdrawn and is no longer at issue.  *See* Pennington's Paragraph 7 Notice ¶ 10.  Moreover, the survey, which tested only the television commercial, is irrelevant to Pennington's display trays advertising deep, healthy roots.  *See supra* ¶¶ 180-81; 183.

184.    Dr. Jacoby, as a quintessential expert for hire, has offered opinions which come back to haunt him here.  In another case, *Smith v. Wal-Mart*, Dr. Jacoby opined, "[l]et me refer to the law.  You have a wonderful term.  It's called *ipse dixit*.  And as I understand it, it means it is so because I say it is so.  Well, in science it ain't so until you test it.  And so here I think this would happen, but I don't know it until I test it.  Until then, it's *ipse dixit*."  *Smith v. Wal-Mart Stores, Inc.*, 1:06-cv-526 (W.D. Ga.), Ex. 6 at 51-52.  The court relied upon this deposition testimony to reject Dr. Jacoby's contradictory assertion that results from a consumer survey related to certain allegedly infringing t-shits could be applied to all the shirts at issue, because the shirts he tested were "reasonably representative" of all the shirts.  The Court wrote:

> "Jacoby's own deposition testimony supplies a fitting framework for analyzing this issue.  When declining to offer an opinion about whether consumers would also be confused . . . Jacoby stated that consumers respond differently to a given stimulus depending on the context in which it is presented, and because his survey tested only [Plaintiff's] CaféPress web stores, his survey provided him with no data upon which to answer the question about consumer confusion regarding [Plaintiff's] website."

*Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp.2 d 1302, 1332 (N.D. Ga. 2008).

185.    In light of these admissions, it is clear that Dr. Jacoby's opinions are connected to his data only by his *ipse dixit* and lack proper fit to the advertising at issue. Such testimony must be excluded. *See*, *e.g.*, *Joiner*, 522 U.S. at 146.

186.    At a minimum, this Court should give the Jacoby survey no weight, given its lack of relevance to the issues in the case. *See* FED. R. EVID. 401, 402.

### 2.    The Jacoby Survey must be Excluded as Scientifically Unreliable

187.    Dr. Jacoby's survey must also be excluded as scientifically unreliable, because its high level of false positives reveals that the questions were impermissibly biased and leading. See Trial Tr. 761:7-15. In some cases, Dr. Jacoby did not include among the responses to his closed-ended questions a choice that accurately represented Pennington's claim. *See id.* at 751:20-24. Moreover, the responses to Dr. Jacoby's open-ended questions did not reveal deception. *See id.* at 816:15-25.

188.    This type of biased and gerrymandered survey is not the product of reliable principles and methods, as Pennington's rebuttal expert witness, Dr. Gary Ford, explained. *See Daubert*, 509 U.S. at 592-93. The Court must review it with particularly careful scrutiny given that Dr. Jacoby is the "quintessential expert for hire." *See Johnson*, 484 F.3d at 435.

### a.    "Twice as Much Seed" Questions

189.    Dr. Jacoby admits that only 12 respondents of 410 in his test group answered in response to his open-ended question that the commercial means that Pennington's product has "twice as many seeds" as Scotts'. Trial Tr. at 736:11-23. Dr. Ford's analysis of the responses to open-ended questions in the Jacoby survey revealed only an 8.3 percent rate of deception. *Id.* at 816:15-25. Moreover, after subtracting out respondents who gave inconsistent responses to different questions, Dr. Ford arrived at a rate of only 7.1 percent deception. *Id.* at 817:1-10.

190.    Dr. Jacoby admits that in another case, *Hill's Pet Nutrition v. Nutro Products*, he testified under oath that if there is deception, a survey gets hits of 15, 20, 25, 30, or 40 percent deceived in response to open-ended questions. *Id.* at 742:13-17.  He further admits that this rate of deception found by the open-ended questions in his survey does not reach the 15 percent threshold typically required by courts.  Jacoby Dep. at 66:3-8.  He testified at his deposition, "[w]hat you can rely on from [Dr. Ford's analysis] is that it's giving you smoke.  That there are enough people there – it's not zero people." *Id.* at 66:14-16.  However, Dr. Jacoby cannot escape his own statement that the level of deception found by his survey in response to open-ended questions is well below the "15, 20, 25, 30, or 40 percent deceived" that he testified in *Hill's* indicates an advertisement is deceptive.  *See* Trial Tr. at 742:13-17.

191.    Dr. Jacoby's control group 2 viewed a commercial which removed the phrase "put in twice as much seed" and the image of the seed going through the actor's hands. *Id.* at 759:22-24.  Among this group of people, who did not see the hands with the seeds or hear the words "put in twice as much seed," 31.3 percent of respondents thought the commercial said the advertised product puts in twice as much seed as the other product. *Id.* at 761:7-12.  However, Dr. Jacoby has testified that the maximum amount of false positive responses or noise he would want to see in response to such a question is 10 percent. *Id.* at 758:18-759:5.  Dr. Jacoby admits that the 31.3 percent of false positive responses to this question is well above the 10 percent he would hope to see. *Id.* at 761:7-15.  Dr. Jacoby further admits that the reason for this high level of false positive responses could be acquiescence. *Id.* at 762:6-9.

192.    Dr. Ford explained that it is very unusual to see false positives in the neighborhood of 30 or 25 percent, and that this indicates that the question was biased and

leading.  *Id.* at 832:20-833:24.  Dr. Jacoby agrees.  In his rebuttal expert report in another case, *Ameritox, Ltd. v. Aegis Sciences Corp.*, Dr. Jacoby opined, "[w]hen, as is the case here, we find the same closed-ended question asked with respect to a completely truthful ad . . . generates a miscomprehension rate of 36 percent among a sample of physicians, we have good reason to believe that was the question and/or the procedures, not the ad, that were responsible for creating this 36 percent."  No. 07-80498-civ-MARRA (S.D. Fla. Sept. 18, 2008).

193.    Indeed, Dr. Jacoby admits that the rates of false positive yielded by his closed-ended questions suggests there could be something wrong with the questions:

Q.    And in fact, haven't you provided an opinion that when you have that error rate at the 30 percent level, it should cause you to go back and at least look at your questions and see if there is something wrong with the way you asked the questions?

A.    Yes.

*Id.* at 764:15-765:6.

194.    Dr. Jacoby's closed-ended questions were also flawed and biased in that there was no choice that accurately represented the meaning of Pennington's advertisement.  For example, the response to Dr. Jacoby's closed-ended question regarding the meaning of "twice as much seed" (asked of respondents who said in response to question 180 that the commercial did say the advertised product puts in twice as much seed) which Dr. Jacoby considered favorable to Pennington was "puts in twice as much seed" means "the seeds weigh twice as much."  *Id.* at 750:4-17.  But Dr. Jacoby admits that the plural word "seed̲s" appears nowhere in the challenged advertising.  *Id.* at 751:20-24.

195.    Both  Pennington's and Scotts' witnesses agree that Pennington's claim is that the total amount of seed in a bag of Smart Seed, by weight, is twice as much as the amount in Turf Builder, by weight, ***not*** that the individual seeds in the Smart Seed bag are heavier.  *Id.* at 82:15-

63

24 (Mr. Sass testifying, "Q. You know that Pennington means its two times the seed based on the **weight of the bag**, right?  A. Yes.") (emphasis added); *id.* at 113:8-15 (Mr. Crow testifying, "Q. [I]s it your contention that when a consumer sees Pennington's twice the seed advertising, they will believe that that refers only to the weight of the seeds? . . . A.  So I am clear, it is the weight of the **seed, not of the seeds**.") (emphasis added); *id.* at 820:16-21 (Dr. Ford testifying, "I believe that from discussions I have had with counsel, that Pennington actually would say that use of the plural term "seeds" in there does not communicate accurately what they perceive the ad to mean, which is about the weight of seed, singular, rather than plural.").

196.    Dr. Jacoby acknowledges that a closed-ended question in a false advertising survey "could be improved" if its answer choices do not contain a response that accurately represents the intended meaning of the claim.  *Id.* at 756:11-15 (admitting that his closed-ended question regarding Pennington's lift test "could have been improved" if the answer choices contained a positive response that accurately represented Pennington's claims); *see also PBM Prods, LLC*, 639 F.3d at 122 (holding that a survey can only provide proof of implied falsity where it accounts for the actual allegations in the case).

197.    Thus, Dr. Jacoby's questions regarding Pennington's "put in twice as much seed" claim were flawed, leading, and biased and must be excluded pursuant to Rule 702 and *Daubert*.

### a.  "Lift Test" Questions

198.    In addition to being irrelevant to any advertising claims at issue, Dr. Jacoby's questions regarding the lift test in Pennington's commercial are plagued by rates of false positives which Dr. Jacoby admits are unacceptably high, as well as answer choices to closed-ended questions which Dr. Jacoby admits do not represent Pennington's claims.

199.     Dr. Jacoby's questions regarding the lift test resulted in an even higher rate of false positives than his questions regarding the "twice the seed" claim.  In his control group for question 170—comprised of people who saw a version of the commercial that did not contain the lift test—Dr. Jacoby's survey had false positive rates as high as 66.4 percent, 59.7 percent, and 36.5 percent.  *Id.* at 763:18-764:3; *see also Ameritox*, No. 07-80498-civ-MARRA (Dr. Jacoby opining, "[w]hen, as is the case here, we find the same closed-ended question asked with respect to a completely truthful ad . . . generates a miscomprehension rate of 36 percent among a sample of physicians, we have good reason to believe that was the question and/or the procedures, not the ad, that were responsible. . . .").

200.     Dr. Jacoby's responses to closed-ended questions did not contain a response that accurately represented Pennington's claim.  Dr. Jacoby admits that response choices such as "healthy grass," "grows stronger roots," or "grows healthier grass," were not based on any claim explicitly made in the commercial.  *Id.* at 754:11-23.  In fact, in response to the question, "[b]ut where is the positive answer where they could go check right here, 'Yes, this is Pennington's story, boom, check.  Yes.  That's what the commercial said?"  Dr. Jacoby acknowledged, "You know what? . . .  Question 170 could have been improved if it would have had that.  You are entirely correct."  *Id.* at 756:11-15; *see also PBM Prods., LLC*, 639 F.3d at 122.

201.     The responses to these leading, biased, and admittedly flawed questions must be excluded as scientifically unreliable pursuant to Rule 702 and *Daubert*.

## **CONCLUSION**

Pennington respectfully requests that this Court enter judgment in its favor on Scotts' claims against Pennington and Pennington's claims against Scotts.

Dated:  September 3, 2013                   Respectfully submitted,

                                           **PENNINGTON SEED, INC.**

                                            _/s/_  Charles Sims
                                           Charles M. Sims, Esq. (VSB No. 35845)
                                           Thomas M. Wolf, Esq. (VSB No. 18234)
                                           LECLAIRRYAN, A PROFESSIONAL CORPORATION
                                           951 East Byrd Street, 8th Floor
                                           Richmond, Virginia 23219
                                           804-783-2003 Telephone
                                           804-783-2294 Facsimile
                                           Charles.sims@leclairryan.com
                                           Thomas.wolf@leclairryan.com

                                           Ronald Y. Rothstein (*pro hac vice*)
                                           Kevin P. McCormick (*pro hac vice*)
                                           WINSTON & STRAWN LLP
                                           35 West Wacker Drive
                                           Chicago, IL 60601
                                           Phone:  312-558-5600
                                           Fax:  312-558-5700
                                           rrothstein@winston.com

                                           *Attorneys for Pennington Seed, Inc.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on the 3rd day of September, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Cassandra C. Collins ("Sandy")
> John G. Maynard, III
> Stephen P. Demm
> Thomas G. Slater, Jr.
> Shelley L. Spalding
> HUNTON & WILLIAMS LLP
> 951 E. Byrd Street
> Riverfront Plaza
> Richmond, VA 23219
> 788-8200 phone
> scollins@hunton.com
> jgmaynard@hunton.com
> sdemm@hunton.com
> tslater@hunton.com
> sspalding@hunton.com
>
> Bradley W. Grout
> HUNTON & WILLIAMS LLP
> 600 Peachtree Street NE, Suite 4100
> Atlanta, GA 30308
> 404-888-4283 phone
> 404-888-4190 fax
> bgrout@hunton.com
>
> Samuel A. Danon
> HUNTON & WILLIAMS LLP
> 1111 Brickell Avenue
> Suite 2500
> Miami, FL 33131
> 305-810-2500 phone
> sdanon@hunton.com
>
> *Counsel to The Scotts Co. LLC, and The Scotts Miracle-Gro Co., Inc.*

/s/  Charles Sims      
Charles M. Sims, Esq. (VSB No. 35845)
LECLAIRRYAN, A PROFESSIONAL CORPORATION
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
804-783-2003 Telephone
804-783-2294 Facsimile
Charles.sims@leclairryan.com